United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL MATTHEW ZAPATA,                    No. C 10-0176 TEH (PR)

            Petitioner,

        v.                              ORDER DENYING PETITION FOR WRIT
                                        OF HABEAS CORPUS; GRANTING, IN
RODOLFO VASQUEZ, Warden,                PART, CERTIFICATE OF
                                        APPEALABILITY
            Respondent.

_____/

        Pro se Petitioner Paul Matthew Zapata, a state prisoner
incarcerated at Pelican Bay State Prison, seeks a writ of habeas
corpus under 28 U.S.C. § 2254 to vacate his conviction after a trial
by jury.  For the reasons that follow, the Court denies the petition
and grants, in part, a certificate of appealability.

                                    I

        On November 2, 2004, a jury found Petitioner guilty of the
first degree murder of Juan Trigueros.  The jury also found that the
murder was committed for the benefit of a criminal street gang and
that Petitioner had personally discharged a firearm causing death.
1 Clerk's Transcript (CT) 182-83.  On April 4, 2005, the court
sentenced Petitioner to fifty years to life in prison.  2 CT 386-
388; 5 Reporter's Transcript (RT) 1111.

Petitioner appealed his conviction and, on January 9, 2009, the California court of appeal, in an unpublished opinion, affirmed the judgment.  Ex. 3, People v. Zapata, H030016 (California Court of Appeal, January 9, 2009).  On February 13, 2009, Petitioner filed a petition for review in the California Supreme Court and, on April 3, 2009, in a one-sentence order, the Court denied review. Exs. 4 and 5.

On January 13, 2010, Petitioner filed the instant habeas petition raising the following claims: (1) erroneous admission of evidence in violation of Petitioner's rights to due process and confrontation; (2) ineffective assistance of counsel; (3) prosecutorial misconduct; and (4) erroneous jury instruction. On June 30, 2010, the Court found that these claims were cognizable and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Doc. #9.  Respondent has filed an answer and Petitioner has filed a traverse.

II

The following factual background is taken from the order of the California court of appeal and the trial transcript.

On May 18, 2001, Juan Trigueros drove from his home in Soledad to Gilroy, where he attended an electronics class.  After class, Trigueros joined a classmate, Magdaleno Barajas, for dinner and drinks.  Trigueros drank a great deal; his blood alcohol level was later measured at .18, more than twice the level for drunk driving.  While driving after dinner, Trigueros hit a curb and punctured both right-side tires.  Because he could only fix one tire and it was too late to repair or replace the second tire, his car was effectively disabled.  Barajas called a friend for a ride home,

United States District Court
For the Northern District of California

but Trigueros declined a ride, saying he did not want to leave his car unattended.

Trigueros was wearing a jersey with the number 8 in honor of basketball star Kobe Bryant.  An expert testified that the neighborhood in which Trigueros was stranded was claimed as turf by Outside Posse (OSP), a local clique of the Norteños street gang. The expert testified that, by wearing the number 8 in OSP territory, Trigueros made himself a "marked man."

At approximately 2:00 a.m., Trigueros called Marissa Villagomez, whom he was dating, from a phone booth in the parking lot of a 7-Eleven on Leavesley Road.  After conversing for ten to fifteen minutes, he abruptly stopped talking and the line "went dead."

At about that time, Brian Puphal was making a stop at the 7-Eleven so that a friend, whom he was driving home, could buy tobacco.  As Puphal approached the store, he saw one man, in a phone booth, talking on the telephone while another was yelling at him and "[r]aising his arms in anger."  Puphal stopped his pickup about forty feet away with its headlights pointed directly at the two men. He saw the man who was yelling pull out a pistol from his waistband and shoot the other from a distance of two to three feet.  The victim twisted, but did not fall.  The shooter fired a second shot from about six feet.  The victim staggered into the store.  The gunman looked directly at Puphal for a few seconds before running through a nearby car wash.  Shortly thereafter, a white pickup drove slowly past the 7-Eleven.  Puphal entered the store, where Trigueros was lying dead on the floor.  Puphal described the gunman to the police, and within a few days of the shooting, described him to

3

police sketch artist Gilbert Zamora.  Puphal was sure the shooter had a scraggly goatee.  He testified that a June 2001 photo of Petitioner "could be" the gunman.  He failed to identify Petitioner in a pretrial photographic lineup.

Joseph Morton was working at a gas station and convenience market near the 7-Eleven when he heard gunshots.  He saw a man walk "nonchalantly" from the direction of the 7-Eleven, looking backwards as though associated with the shots in some way.  The man walked about half a block in Morton's direction before getting into the passenger seat of a white pickup or SUV which quickly drove away. Morton called 911.

Army recruiter Felipe Davila was making a purchase in Morton's convenience market when he heard "at least two" shots from what "sound[ed] like a nine millimeter."  Unable to credit this perception, he completed his transaction, which took a few seconds, then heard a screeching noise and ran outside in time to see a white truck being driven in a "crazy" manner.  It started to make a right turn, but resumed its original course after hitting a traffic island hard enough to damage the right tires.  Davila described the truck as a white pickup with a chrome bumper and "Toyota" on the tailgate in blue letters.  About a month before trial, police showed Petitioner's pickup to Davila and he said it resembled the truck he had seen on the night of the shooting.  He said that, if he was right, it should have some damage on the tires and, consistent with his statement, there was damage to the right-side tires.

Petitioner belonged to the OSP.  Evidence was received concerning several violent offenses, in which Petitioner participated, that were committed for the benefit of the OSP.  Nancy

**United States District Court**
For the Northern District of California

Echeverria, Petitioner's former girlfriend, testified that, on the night of Trigueros's shooting, she accompanied Petitioner to a barbecue at an OSP member's home a few blocks from the 7-Eleven. Petitioner left between 10:00 and 11:00 p.m. to drive a friend to work.

Sarah Sanchez, a former associate of OSP members, testified that, in May or June 2001, shortly after the shooting, she saw Petitioner at the Ramirez family ranch near Gilroy, where he asked her to do him a favor by driving his pickup truck to Stockton or Manteca. She asked him why, and he replied that he had shot somebody at the 7-Eleven and "needed to get rid of" the truck. She thought he was joking until some time later, when she saw a newspaper report about the shooting. In the fall of 2001, she saw Petitioner's truck, or one that looked like it, parked on a Manteca street near the home of the mother of Rico Clarke, an OSP member whose gang nickname was Sparkie or Sparky.

The jury heard a pretrial statement to Detective Zen by Victoria Lopez, who was married to but separated from another OSP member. In the pretrial statement, Lopez said Petitioner's truck had broken down, apparently while in the possession of Sparkie, who then got Petitioner a black Taurus to use. She said that Petitioner used the black Taurus for about three months right after the murder. At trial, Lopez tried to retreat from these statements by saying she was not sure that Petitioner had ever driven a white truck and then she said that she saw him driving a white pickup after the shooting. She largely denied any memory of her pretrial statements to Detective Zen.

Echeverria testified that she saw Petitioner driving his truck the day after the shooting but, in a pretrial statement to Detective Zen, she said that the truck was gone the day after the shooting and that she was told it was at the Stockton home of Sparkie and his wife Olga.  She acknowledged having told Detective Zen that Petitioner's clothing on the night of the shooting matched that of the shooter as described in news reports, that the police sketch looked "just like" Petitioner when he was trying to grow a goatee, and that whenever she asked Petitioner about the shooting, he got "weird" and said, "I don't know what you're talking about."

Detective Zen, the lead investigator on the case, testified that he first interviewed Echeverria after learning that she had called a police tip line about the killing.  When he showed her the artist's sketch of Trigueros's killer, she laughed or chuckled.  He testified that, when he asked her to explain, "She said, it looks like him [Petitioner] and that was when he was trying to grow a goatee.  She pointed to his chin area on the police sketch."  Detective Zen surreptitiously recorded a second interview with Echeverria, which was played for the jury.  In that interview, Echeverria referred to various circumstances tending to incriminate Petitioner, including that the truck was gone the day after the shooting.  Detective Zen testified that when he told Echeverria she would be subpoenaed for the preliminary hearing, she said that she would refuse to testify, or would testify falsely, out of fear of Petitioner and his friends.

In December 2002, Echeverria told Detective Zen that Petitioner's truck was at the Morgan Hill apartment of Petitioner's then current girlfriend, Priscilla Pena.  Detective Zen went there

and photographed the truck.  When he returned a few months later it was gone and later tracked it to the home of Pena's sister Elizabeth, where police seized it in March 2003.

The defense called witnesses who testified that Petitioner had little, if any facial hair, had never attempted to grow a goatee and, according to one witness, could not grow a moustache or, at best, could grow only a small one.  However, a booking photo of Petitioner taken in June 2001 depicts a somewhat sparse but distinct moustache.  The defense noted that Echeverria testified that Petitioner did not wear jewelry of any kind and that the police sketch of the suspect depicts what looks like a bead necklace. However, other photographs in evidence show that Petitioner had a long tattoo above his collarbone that might be suggestive of a necklace.  At the trial, Puphal testified that he told the sketch artist that the feature "could have been something like a neckline." At the preliminary hearing, however, Puphal had testified that it "looked more like beads and not a tattoo."

In his closing argument, defense counsel emphasized that no eye-witness had identified Petitioner as the shooter, Puphal's description of the shooter did not look like Petitioner, and the three witnesses who incriminated Petitioner--Sanchez, Lopez and Echeverria--were all biased against him and, thus, were not credible.

After deliberating for approximately three hours, the jury returned a verdict of first degree murder.

**7**

**III**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, a federal court may not grant a writ of habeas corpus on any claim adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003) (internal quotation marks and citation omitted). Moreover, in conducting its analysis, the federal court must presume the

correctness of the state court's factual findings, and the
petitioner bears the burden of rebutting that presumption by clear
and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court
explained: "[o]n federal habeas review, AEDPA 'imposes a highly
deferential standard for evaluating state-court rulings' and
'demands that state-court decisions be given the benefit of the
doubt.'"  Felkner v. Jackson, __ U.S. __, 131 S. Ct. 1305, 1307
(2011) (citation omitted).

Even if the state court's ruling is contrary to or an
unreasonable application of Supreme Court precedent, that error
justifies habeas relief only if the error resulted in "actual
prejudice."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Thus,
habeas relief is granted only if the state court's error had a
"substantial and injurious effect or influence in determining the
jury's verdict."  Id.

When applying these standards, the federal court should
review the "last reasoned decision" by the state courts.  Avila v.
Galaza, 297 F.3d 911, 918 n.6 (9th Cir. 2002).  Because the
California Supreme Court summarily denied relief on Petitioner's
claims, this Court looks to the California court of appeal's January
9, 2009 written decision denying Petitioner's direct appeal.

With these principles in mind regarding the standard and
scope of review on federal habeas, the Court addresses Petitioner's
claims.

IV

A

Petitioner claims that the trial court's admission of
extensive hearsay evidence regarding his past crimes violated his

9

United States District Court
For the Northern District of California

1  federal constitutional due process and confrontation rights.  The

2  appellate court stated: "Defendant acknowledges that this point was

3  not raised below, but asserts that this court should either grant

4  discretionary relief from the resulting forfeiture, or should find

5  that he was the victim of ineffective assistance of counsel."  The

6  court then addressed Petitioner's ineffective assistance of counsel

7  claim.  <u>People v. Zapata</u>, H030016 at 6.

8           Unless a habeas petitioner shows cause and prejudice, a

9  federal court may not reach the merits of procedurally defaulted

10  claims in which the petitioner failed to follow applicable state

11  procedural rules in raising the claims.  <u>Sawyer v. Whitley</u>, 505 U.S.

12  333, 338 (1992) (citations omitted); <u>Farmer v. McDaniel</u>, 98 F.3d

13  1548, 1560 (9th Cir. 1996), <u>abrogated on other grounds by</u> <u>Slack v.</u>

14  <u>McDaniel</u>, 529 U.S. 473 (2000).  The Ninth Circuit has recognized and

15  applied the California contemporaneous objection rule in affirming

16  denial of a federal petition on grounds of procedural default where

17  there was a complete failure to object at trial.  <u>Inthavong v.</u>

18  <u>Lamarque</u>, 420 F.3d 1055, 1058 (9th Cir. 2005); <u>Paulino v. Castro</u>,

19  371 F.3d 1083, 1092-93 (9th Cir. 2004).  The cause standard requires

20  the petitioner to show that "'some objective factor external to the

21  defense impeded counsel's efforts'" to construct or raise the

22  claim."  <u>McCleskey v. Zant</u>, 499 U.S. 467, 493  (1991).  A petitioner

23  may also show cause by establishing constitutionally ineffective

24  assistance of counsel, but attorney error short of constitutionally

25  ineffective assistance of counsel does not constitute cause and will

26  not excuse a procedural default.  <u>Id.</u> at 494.  Counsel's mere

27  failure to recognize the factual or legal basis for a claim, or

28  failure to raise the claim despite recognizing it, does not

United States District Court
For the Northern District of California

1  constitute cause.  Murray v. Carrier, 477 U.S. 478, 486 (1986);

2  Villafuerte v. Stewart, 111 F.3d 616, 629 (9th Cir. 1997).

3      The only cause that Petitioner postulates for overcoming

4  the forfeiture of these claims is ineffective assistance of counsel.

5  As discussed below, counsel was not ineffective.  Therefore, habeas

6  relief on the due process and confrontation claims based on

7  admission of past crimes evidence is denied.

                                   B

9      Petitioner asserts several grounds for his claim of

10  ineffective assistance of counsel.

11      To establish ineffective assistance of counsel, a

12  petitioner must show that (1) counsel made errors so serious that

13  counsel was not functioning as the counsel guaranteed a defendant by

14  the Sixth Amendment, and (2) the deficient performance prejudiced

15  the defense such that "there is a reasonable probability that, but

16  for counsel's unprofessional errors, the result of the proceeding

17  would have been different." Strickland v. Washington, 466 U.S. 668,

18  694 (1984).  A reasonable probability is a probability sufficient to

19  undermine confidence in the outcome.  Loveland v. Hatcher, 231 F.3d

20  640, 644 (9th Cir. 2000) (citing Strickland, 466 U.S. at 687).

21      A difference of opinion as to trial tactics does not

22  constitute denial of effective assistance, United States v. Mayo,

23  646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not

24  ineffective assistance simply because in retrospect better tactics

25  are known to have been available.  Bashor v. Risley, 730 F.2d 1228,

26  1241 (9th Cir. 1984).  Tactical decisions of trial counsel deserve

27  deference when: (1) counsel in fact bases trial conduct on strategic

28  considerations; (2) counsel makes an informed decision based upon

investigation; and (3) the decision appears reasonable under the circumstances.  Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  A label of "trial strategy" does not automatically immunize an attorney's performance from Sixth Amendment challenges.  United States v. Span, 75 F.3d 1383, 1389-90 (9th Cir. 1996).  For example, an attorney's misunderstanding of the law, resulting in the omission of his client's only defense, is not a strategic decision and amounts to ineffective assistance of counsel.  Id.

1

Petitioner argues that the prosecution's gang expert, Police Officer Geoff Guerin, should not have been permitted to testify about hearsay accounts of gang-related offenses in which Petitioner was involved, or that the jury should have been admonished not to accept such testimony for the truth of the matters asserted.  He claims that, because trial counsel did not object to this testimony or request a limiting instruction, he was denied effective assistance of counsel.

At trial, the prosecutor asked Officer Guerin to describe the conduct of the various gangs in the Gilroy area and then asked him to describe a number of gang-related crimes in which Petitioner had been held accountable.  Officer Guerin recounted the details of Petitioner's past crimes from police reports.  Officer Guerin testified that, in his expert opinion, Trigueros's shooting was a gang-related crime.

The California appellate court noted that, insofar as Officer Guerin's testimony might be considered for any purpose other than as the basis for his expert opinion concerning the applicability of the anti-gang statutes, it was objectionable.  The

United States District Court

For the Northern District of California

1  appellate court also noted that the testimony was hearsay and lacked
2  any foundation in the witness's firsthand knowledge.  The court
3  agreed with Petitioner that, if counsel had objected, the testimony
4  could have been excluded, or more likely would have admitted for a
5  limited purpose, as could have been reflected in a limiting
6  instruction.  People v. Zapata, H030016 at 6.

7         However, the appellate court held that this did not mean
8  that counsel should have objected to Guerin's testimony or that his
9  failure to do so constituted ineffective assistance.  The court
10 explained that, to establish deficient performance on direct appeal,
11 as opposed to habeas review where extrinsic evidence may be
12 received, the record must affirmatively demonstrate that counsel
13 lacked a rational tactical reason for the challenged conduct.  The
14 court noted that an objection on the basis of hearsay or lack of
15 foundation goes to the form of the evidence and that it was likely
16 the evidence would be admissible if presented in a different manner.
17 The evidence of Petitioner's participation in gang-related crimes
18 was most likely admissible to show motive or intent.  Therefore, if
19 the evidence could not be introduced through the testimony of
20 Officer Guerin, it would most likely have been introduced through
21 the testimony of an individual with personal knowledge of the
22 subject.  People v. Zapata, H030016 at 7.

23        With this in mind, the court concluded that counsel could
24 have withheld objection based on the reasonable strategy that a
25 successful hearsay or foundational objection would have compelled
26 the prosecution to introduce other, possibly more damaging evidence,
27 such as testimony from one or more victims of Petitioner's past
28 crimes.  People v. Zapata, H030016 at 7-8.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Petitioner argued to the state court, as he does here,

2  that, if the prosecutor had stronger evidence, he would have

3  presented it.  The state court rejected this argument, explaining

4  that a prosecutor might have any number of reasons to prefer to

5  introduce evidence of this type in the form of a hearsay summary,

6  including the fact that it was more efficient to present the

7  information as a summary rather than with the testimony of

8  individual victims.  The court surmised that both the prosecution

9  and defense could have its own reasons for preferring hearsay--the

10  prosecution for conciseness and convenience and the defense for

11  reduced visceral impact.  People v. Zapata, H030016 at 8.

12    The court also surmised that a request to limit the

13  evidence to the jury's consideration of the soundness of the

14  expert's opinion would have meant that the jury would have heard

15  about Petitioner's other crimes twice: once as a basis for expert

16  opinion and once as substantive evidence of conduct to prove motive

17  and intent.  The court concluded that "[N]othing in this record

18  dispels the possibility that counsel reasonably believed it was

19  preferable to just have the jury hear it once, even if this meant

20  foregoing a meritorious hearsay objection."  People v. Zapata,

21  H030016 at 9.

22    As Respondent points out, the indictment charged, pursuant

23  to California Penal Code section 186.22(b)(1), that Petitioner had

24  committed the murder of Trigueros "for the benefit of, at the

25  direction of, or in association with a street gang."  1 CT 182-83.

26  Under California law, a street gang is an organization whose members

27  "individually or collectively engage in or have engaged in a pattern

28  of criminal gang activity."  Cal. Pen. Code § 186.22(f).  A "pattern

**14**

1  of criminal gang activity" arises out of "the commission of,

2  attempted commission of, conspiracy to commit, or solicitation of

3  . . . two or more" specified crimes.  Cal. Pen. Code § 186.22(e).

4  The elements of a section 186.22 gang enhancement may be established

5  through expert testimony regarding the culture, habits and

6  psychology of gangs.  People v. Sengpadychith, 26 Cal. 4th 316, 322

7  (2001); People v. Gardeley, 14 Cal. 4th 605, 617 (1996).

8  Furthermore, as long as the material that forms the basis of expert

9  opinion is reliable, even material that is ordinarily inadmissible,

10  such as hearsay, can form the proper basis for an expert's opinion

11  testimony.  Id. at 618.

12        In light of this authority, Officer Guerin's testimony,

13  even if it was, in part, hearsay, was admissible as a basis for his

14  opinion that the murder of Trigueros was to benefit or promote the

15  OSP street gang.  Because Officer Guerin's testimony regarding

16  Petitioner's prior crimes was not subject to a hearsay objection,

17  defense counsel was not ineffective for failing to object on this

18  basis.  Although defense counsel could have requested a limiting

19  instruction, the fact that the same evidence would have been

20  introduced a second time to prove motive and intent, made it

21  reasonable for counsel to believe, as concluded by the state court

22  of appeal, that it was preferable to have the jury hear it once and

23  forego the instruction.  See Musladin v. Lamarque, 555 F.3d 830,

24  845-46 (9th Cir. 2009) (counsel's decision not to request limiting

25  instruction on damaging evidence is within acceptable range of

26  strategic tactics employed to avoid drawing attention to damaging

27  testimony).

28

United States District Court
For the Northern District of California

Therefore, counsel's performance was not ineffective for failing to object to or request a limiting instruction regarding Officer Guerin's testimony about Petitioner's previous crimes.

Because counsel's performance was not deficient, there is no need to address the second <u>Strickland</u> prong regarding prejudice. However, as discussed below in the section on prejudice, even if counsel's performance was deficient, Petitioner has failed to establish that, but for counsel's unprofessional conduct, there is a reasonable probability that the result of the trial would have been different.

2

Petitioner claims that counsel was ineffective for failing to object to the lay opinions of Victoria Lopez and Nancy Echeverria who said that Petitioner was the person who shot and killed Trigueros.

The jury heard Detective Zen's pre-trial interview of Echeverria, in which she gave reasons for her belief "that I know he [Defendant] did it." At the trial, Echeverria testified that she did not remember what she had told Detective Zen when he interviewed her. The interview was used to refresh her recollection and was played to the jury. It was admitted into evidence, over defense attorney's objection. 2 RT 382. The relevant parts of the interview are:

> Zen: Okay, Now what, ah, after . . . he did the
> shooting . . . He never said anything to you.
> So, directly, you can't say that he said, I shot
>
> . . .
>
> Echeverria: Right, Right.

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> Zen: But if you said because OSP just, just is common knowledge or, or what?
>
> Echeverria: Ahh, that I know that he did it?
>
> Zen: Yeah.
>
> Echeverria: Basically, yeah.  I mean, common sense tells you there's . . . it was basically all common sense.  I always keep abilities.  I know him inside out.  I know when he does, and I know when he doesn't do.  And I knew, I knew.
>
> . . .
>
> Echeverria: [H]e never told me that.  He never said, well, when I bring it up, he gets weird, and he just wouldn't even want to talk about it. It's just like, he'd go, I don't know what you're talking about . . .
>
> . . .
>
> Zen: You know, how, there's no point . .. . for you to realize or assume or something.
>
> Echeverria: Well, the, for the fact of the main thing is, is that, he was gone during that time. He was wearing that outfit.  The sketch looked just like him.  The truck was gone the next day, in the morning.
>
> Zen: Okay.
>
> Echeverria: And so everything kind of made sense.  And I even told the family, I'm like, he did it.  I'm like, you want us to think that he's gonna lend the truck out to some guy.  And he's gonna be car-less for like, a year and a half?  Come on.

People v. Zapata H030016 at 10 n.3.

        The jury also heard Lopez's pretrial statement to Detective Zen.  In answer to Detective Zen's question, "what can you tell me about [Trigueros's murder]?" Lopez answered, "Honestly, I'll tell you, I kind of think that it was stupid Paul."  People v. Zapata H030016 at 10 n.4.

17

United States District Court
For the Northern District of California

1        The California appellate court noted that the statements
2   were objectionable under either California's rule of evidence
3   governing lay opinion or under the general prohibition against
4   opinion testimony concerning a defendant's guilt of the charged
5   offense.  The court concluded, however, that because the record did
6   not establish that counsel lacked a tactical reason for allowing
7   these opinions into evidence, his failure to object did not
8   constitute ineffective assistance.

9        The record shows that counsel objected to Lopez's response
10  to the prosecutor's question whether she had told Detective Zen that
11  she "thought Paul Zapata was the shooter because that's the only --
12  one that you had ever seen driving a truck like that?"  2 RT 311.
13  Lopez responded, "I don't remember telling him that.  I don't
14  remember."  2 RT 312.  Counsel objected to her opinion as
15  speculative and asked that the answer be stricken.  2 RT 312.  The
16  court responded that "the question and answer will stand limited
17  only as to what her state of mind is."  2 RT 312.  Thus, counsel may
18  not have objected to her opinion in her pre-trial statement to
19  Detective Zen because it would have been futile to do so.

20       Furthermore, as the appellate court noted, the record
21  reflects that Echeverria's and Lopez's accusations of Petitioner
22  played a central role in the defense strategy.  During cross-
23  examination, Echeverria admitted that she was angry at Petitioner
24  because he cheated on her with other women. 2 RT 404.  During cross-
25  examination, Lopez admitted that, when she was brought to the police
26  station to be questioned by Detective Zen, she had been afraid that
27  her children would be taken away from her.  2 RT 323.  In his
28  closing argument, counsel grouped Echeverria and Lopez with Sarah

18

United States District Court

For the Northern District of California

Sanchez, who had incriminated Petitioner by testifying that he admitted to her that he had shot someone at the 7-Eleven.[1] Counsel pointed out that Sanchez was angry with Petitioner because, after she ended her relationship with an OSP member, other OSP members, including Petitioner, had assaulted her new boyfriend who was not an OSP member. 4 RT 907-08. Counsel labeled Echeverria, Lopez and Sanchez, "informants," who had come forward with a story incriminating Petitioner for their own purposes. 4 RT 854, 901, 907-08, 911, 919-20, 927. Counsel charged investigators and the prosecution with stubborn credulousness by believing the obviously false stories of these three women and, in doing so, he himself cited the three incriminating "opinions." Given this strategy, counsel reasonably could conclude that it would have been futile to object to these witnesses' opinions while allowing in the factual assertions. In fact, their opinions are what counsel emphasized in his closing as demonstrating their prejudice and intent to frame Petitioner.

Thus, because counsel had a reasonable strategy for not objecting to the opinions in the pre-trial statements of Echeverria and Lopez, his performance was not deficient.

3

Petitioner asserts that counsel was ineffective for failing to object to Officer Zamora's testimony that the sketch he drew of the killer under the direction of eyewitness Puphal

---

[1] Petitioner does not include Sanchez's incriminating testimony in his claim but, as pointed out by the appellate court, counsel's treatment of Sanchez's testimony is germane to the existence of his tactical motive for acquiescing in the introduction of similar incriminating statements by Echeverria and Lopez.

resembled a June 2001 photograph of Petitioner because the testimony did not meet the requirements for admissibility as lay opinion and did not help the jury to understand any properly admitted testimony.

Because Petitioner was thinner at the time of the trial in 2004 than he was at the time of shooting in 2001, <u>see</u> 7 RT 385-86 (Echeverria stated that Petitioner looked thinner in the courtroom than he did in 2001), the prosecutor showed Zamora Exhibit 31, a photograph of Petitioner taken in June 2001, and asked him to compare it to his 2001 sketch based on Puphal's description of the shooter.

The testimony at issue is as follows:

Q: [C]ompared to your original sketch, do you see features that are similar between the person depicted in 31 and your original sketch?

A: Well, I'm just looking at it in a likeness scale for me, and my thing is when I look at my sketch compared to this photograph of whoever this is I would say that there's definitely some likeness. . . . Obviously, there's some discrepancies with the goatee.  There seems to be some more hair here, here than there, but here are definitely some likenesses.

Q: The nose is right on?

A: I would say it's comparable.

Q: The lips?

A: Comparable.

Q: Mustache?

A: Yes.

Q: Eyebrows?

A: Yes.

Q: Shape of the face generally?

**United States District Court**

For the Northern District of California

1

2

> A: Yeah, to me I think my guy is stocky, and the fellow here seems to be a little wide and stocky.

3   2 RT 480-81.

4        Defense asserted, in an unrecorded sidebar conference, an

5 advance objection to improper opinion testimony comparing the photo

6 and the sketch but, after the witness testified, counsel said that

7 it had been his concern that "Mr. Zamora was going to be asked what

8 I felt would be an improper opinion.  That's not what transpired.

9 And my concerns were allayed."  2 RT 488.

10        The state appellate court concluded that this evidence

11 should not have been admitted because, as was evident from Officer

12 Zamora's testimony, he had no independent recollection of anything

13 about the case.  The appellate court noted that, because the

14 prosecutor did not qualify Zamora as an expert on physiognomic

15 resemblance or any other subject, his testimony was only admissible

16 if it met the requirements for lay opinion under California Evidence

17 Code section 800, which it did not because it did not help the jury

18 understand any of his properly admitted testimony.

19        However, the appellate court concluded that counsel's

20 failure to object did not constitute deficient performance because

21 he could have rationally thought that "the degree of resemblance

22 between the two depictions was a matter as to which anyone's opinion

23 was as good as anyone else's" and that "the jury might find less

24 resemblance than he claimed, and thus find the prosecution's overall

25 case that much less credible."  <u>People v. Zamora</u>, H030016 at 16.

26 The appellate court also concluded that the admission of the

27 evidence would not have influenced the verdict because Officer

28 Zamora did not say that the sketch depicted the same person as the

photo, he merely said that there was "some likeness" and that
certain features were "comparable."  The court continued, "Having
examined both exhibits, we do not believe there is any real
possibility that the jury would have failed to reach this same
conclusion on its own.  There are arguable resemblances, as well as
differences, between them.  The critical question was whether the
resemblance was great enough to warrant an inference that defendant
was the person seen by the eyewitness Puphal and described by him to
Officer Zamora.  The latter was not asked, and did not attempt to
answer, that question."  <u>People v. Zapata</u>, H030016 at 16.

Petitioner argues that the appellate court's opinion was
unreasonable because Officer Zamora's testimony regarding the
similarities between his sketch and the 2001 photograph of
Petitioner lent his expertise to the most important question before
the jury, whether Puphal was describing Petitioner or an
unidentified person to Officer Zamora as the shooter.  Petitioner
argues that it was extremely important to the prosecutor's case to
have Officer Zamora testify that the sketch resembled Petitioner
because Puphal had failed to identify Petitioner as the shooter in a
lineup and, thus, there was no evidence placing Petitioner at the 7-
Eleven at the time of the shooting.

As noted by Respondent, Petitioner was in the courtroom
during the entire trial and, thus, the jurors could compare him to
Zamora's sketch on their own.  The jurors also had both Officer
Zamora's sketch and the 2001 photograph to compare and could draw
their own conclusions regarding the similarities between the two.
In light of the deference that must be given to state court opinions
under AEDPA, this Court cannot say that the appellate court's

analysis on both deficient performance and prejudice was
unreasonable.

**4**

Petitioner argues that counsel was ineffective for failing
to object to hearsay testimony regarding the location of his Toyota
pickup truck.  The evidence regarding the Toyota pickup was
important because a substantial part of the prosecution's case was
based on the premise that Petitioner's white Toyota pickup truck,
which matched the description of the truck driving the gunman away
from the scene of the crime, disappeared from Gilroy immediately
after the shooting.

**a**

Petitioner contends that his counsel should have objected
to Echeverria's testimony that he sent his truck to Sparkie in
Stockton, where it remained until 2002, when his family had it towed
back to Hollister.  Petitioner claims this testimony was hearsay and
without a proper foundation.

In her pretrial statement to Detective Zen, Echeverria
stated that she knew Petitioner was the shooter and that one of the
circumstances that led her to believe this was that his "truck was
gone the next day, the next morning," and that it was unlikely that
Petitioner had lent the truck out to some other person.  When
Detective Zen reviewed the circumstances with her, Echeverria again
stated, "That truck was gone the very next morning or next day."
Asked how she knew this, Echeverria stated, "He didn't drive it no
more," and "Everybody knew that it was gone like, the next day."

As the state appellate court pointed out, Echeverria's
recorded statements did not become admissible until she contradicted

them in her trial testimony, which she did in many instances.  For instance, at the trial, she testified that she saw Petitioner driving the truck a few hours after the shooting and that, in late spring or early summer of 2001, Petitioner had driven her to San Jose in the truck.  She also testified that she saw the truck in August, 2002 in Hollister, where people were trying to repair it. She testified that she originally lied to Detective Zen because she wanted to "burn" Petitioner.  Therefore, many of Echeverria's pretrial statements were admissible to impeach her and were not subject to a hearsay objection.

The appellate court also pointed out that Echeverria's statements about the truck disappearing was information that she personally observed as Petitioner's girlfriend and, thus, they were not hearsay and were within her personal knowledge and, in this regard also, an objection to them would not have been sustained. The appellate court noted, however, that Echeverria's statement to Detective Zen that she learned of the whereabouts of Petitioner's truck from Sparkie's wife or the mother of Sparkie's girlfriend, who said, "yeah, we have [the truck].  We're driving it around," was objectionable as hearsay.  The court theorized that defense counsel may not have objected to it, not because it helped the defense, but because Echeverria's trial testimony on the same subject might do so.  At trial, Echeverria testified that Sparkie's mother or grandmother told her that Petitioner's truck was "over there" but that it was "broken down."  In his cross-examination of Echeverria, counsel sought to elaborate on this point, eliciting testimony that the truck had broken down two or three times and Petitioner could not afford to get it fixed.  Thus, counsel might have allowed the

United States District Court
For the Northern District of California

prosecution to produce hearsay testimony about the truck because it opened the door to Echeverria's hearsay testimony regarding its disrepair, which provided the defense with an explanation to compete with the inference of deliberate concealment put forth by the prosecution.

The appellate court also found it "impossible to say" that the admission of the challenged evidence was prejudicial to Petitioner.  This conclusion was based on the fact that Echeverria's statements that the truck had disappeared immediately after the shooting was admissible and that the additional hearsay statements about the truck being in Hollister or Stockton would likely not have changed the jury's view of whether or not Petitioner hid his truck after the shooting.

The appellate court's analysis regarding deficient performance and prejudice is not unreasonable.

**b**

In a pretrial statement to Detective Zen that was placed before the jury, Lopez said that Petitioner's truck had "broken down," while in the possession of Sparkie, who then got Petitioner a black Taurus.  Detective Zen asked Lopez, "Was it broken down or did they just stash it out?"  Lopez replied, "The story they gave me is that it broke down when they were, when Paul was working with, with Sparkie."  She said that Petitioner had used a black Taurus for about three months after the murder.  Detective Zen asked if "they just swapped," to which Lopez replied, "That, see that's why I was like, I told Edward, 'What happened to the truck?' and he's like, he said that it was broke, that, it's at Sparkie's. . . . And then I had told [defendant], 'What happened to the truck?'  And he said

that, he goes, 'Oh, well, it broke down when I was working with Sparkie.' He goes, 'He let me come over in this car.'"

At trial, Lopez tried to retreat from these statements. She testified that she was not sure that Petitioner ever had a white truck; then she testified that the truck that was shown to her in a photographic exhibit looked too small to be Petitioner's truck. She also testified that she saw Petitioner driving a white pickup after the shooting and then, several weeks later, he got a black car. She denied any memory of her pretrial statements to Detective Zen.

Petitioner claims that Lopez's recorded pretrial statements to Detective Zen were objectionable hearsay based on her statement that 'they' told her that the truck had broken down when Petitioner was working with Sparkie and that Sparkie had the truck and had given Petitioner a black Taurus to use. Petitioner notes that Lopez said that she learned of some of this information from her husband Edward.

The appellate court rejected Petitioner's claim, reasoning as follows:

> [S]ome of this testimony may have been subject to exclusion as hearsay or for lack of foundation, but again it is impossible to say that counsel had no tactical motive for failing to require that the objectionable matter be excised and excluded. Lopez's pretrial statement has defendant himself telling her that the truck was in the possession of Rico "Sparky" Clarke. At trial Lopez flatly denied that defendant had told her such a thing. This made her pretrial statement admissible as a prior inconsistent statement. (Evid. Code, section 1235.) Defendant's own statements are of course admissible, at the prosecution's instance, as statements by a party opponent. (Evid. Code section 1220.) Given that this evidence was admissible over a hearsay objection, it is impossible to say that counsel had no tactical reason for failing to object to other evidence

**United States District Court**
For the Northern District of California

1

> to similar effect, or that the admission of such
> evidence was prejudicial to the defense.

2

<u>People v. Zapata</u>, H030016 at 23.

3

4        As pointed out by the state court, some of the evidence

5   about Petitioner's truck was not subject to a hearsay objection and

6   the jury would hear from Lopez and from Echeverria that his truck

7   was at Sparkie's house after the shooting.  Therefore, it was

8   reasonable for counsel not to object to any hearsay testimony on the

9   same subject.

        Accordingly, the appellate court's analysis was not an

10  unreasonable finding of facts in light of the evidence.

11                                    c

12       Petitioner objects to Detective Zen's testimony about his

13  investigation of a telephone conversation regarding a white truck.

14  This claim involves the testimony of Anthony Villalobos, a

15  prosecution witness who authenticated a January 2003 telephone

16  conversation in which he was speaking to Eric Garcia, an OSP member.

17  The conversation was recorded because it originated from the Santa

18  Clara County jail.  In the conversation, Villalobos referred to a

19  scene in the television program, "Fugitive Watch," involving a white

20  truck.  Garcia seemed not to comprehend, and Villalobos said,

21  "[R]emember that, remember that white truck a long time ago," and

22  then explained, "[I]t's fucking still there.  Chivo came over ear

23  [sic] . . . about like 15 minutes ago, 20 minutes ago, told him we

24  needed to find [a way] to get it out of here right now."  Later he

25  said, "I already talked to that ugly mother fucker, that scary guy.

26  . . . And he said . . . get rid of it anyway, it don't matter.  So

27

28

United States District Court
For the Northern District of California

1  . . . I called Chivo and Chivo said we can take it to his people's

2  house out in the country and fucking part [sic] it out or whatever."

3  <u>People v. Zapata</u>, H030016 at 23-24.

4          At trial, Villalobos testified that the white truck was

5  Petitioner's, for which the police had been searching.  But, he also

6  testified that he had only seen the white truck in a magazine

7  article or television program produced by Fugitive Watch, a local

8  crime-prevention organization.  Villalobos also testified that he

9  did not know to whom the "scary guy" referred, although later, he

10 conceded that it could possibly be Petitioner, whose gang nickname

11 was "Spooky."  However, he insisted that he was not referring to

12 Petitioner's truck, but only something similar that he had seen on

13 Fugitive Watch.  The prosecutor asked, "What if I was [sic] to tell

14 you that it never ran on Fugitive Watch?"  Villalobos replied, "I'd

15 have to say you're lying," and insisted, "I seen it on Fugitive

16 Watch."

17         It was in this context that Detective Zen testified that

18 he had investigated whether the May 19, 2001 murder ever ran on the

19 show the "Fugitive Watch."  Detective Zen stated:

20         I talked to Jay Shields of the San Jose Police
           Department, the person that is co-owner of the
21         Fugitive Watch.  Let me back up.  I first asked
           another detective with the Gilroy Police
22         Department to check on it for me.  He checked
           the dates of 2000/2001 and found that there was
23         no airing of Fugitive Watch having to do with
           this case.  I then realized that he only checked
24         2001.  I called Mr. Shields back and told him or
           asked him, which he agreed and checked from the
25         year 2000 until present and he said that it was
           not aired. . . .
26

   2 RT 701.
27

28

                                      28

United States District Court
For the Northern District of California

1    The appellate court concluded that the challenged

2  testimony might have been successfully objected to as hearsay.

3  However, the court reasoned that counsel could have had a tactical

4  reason for declining to object.  The court posited that, if

5  Detective Zen's testimony was challenged, the source of the evidence

6  in question, the program's co-owner, could readily be summoned as a

7  witness, and he might give testimony more damaging than Detective

8  Zen's hearsay testimony.  The court stated:

9           [O]ne potential for increased damage is
            reflected in the failure of Detective Zen's
10          testimony to squarely meet the most exculpatory
            interpretation that might be placed on
11          Villalobos's testimony.  Villalobos did not
            assert-at least not clearly-that he saw an
12          episode of Fugitive Watch concerning the 7-
            Eleven shooting.  He claimed, or at least could
13          be understood to claim, to have seen a white
            pickup being sought in connection with some
14          unspecified murder, and to have been concerned
            that the mere resemblance between that pickup
15          and defendant's, which he had been told was
            sought by police, might bring unwanted police
16          attention to Villalobos's own activities, which
            he conceded tended toward the unlawful.  Had a
17          witness with personal knowledge of the program's
            content been called, he might have testified
18          that there was never any episode involving a
            pickup resembling defendant's.  Defense counsel
19          might thus have very well concluded that there
            was little promise and much risk in objecting to
20          Zen's hearsay testimony.

21  People v. Zapata, H030016 at 25.

22       Petitioner argues that the testimony of the program co-

23  owner would not have been more detrimental to his defense than

24  Detective Zen's testimony.

25       However, as explained by the state appellate court, a

26  witness with knowledge of all the Fugitive Watch programs could have

27  testified that an episode with a white pickup never aired, and this

28  would have been more detrimental to Villalobos's credibility than

Detective Zen's hearsay testimony.  Because counsel could have had this strategic reason for not objecting to Detective Zen's testimony, the state court's denial of this claim was not contrary or an unreasonable application of <u>Strickland</u> or an unreasonable determination of the facts.

C

Petitioner asserts several grounds for relief based on prosecutorial misconduct.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  Under <u>Darden</u>, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005).  Even if the prosecutor's actions constituted misconduct, when a curative instruction is issued, the court presumes that the jury has disregarded inadmissible evidence inadvertently presented to it and that no due process violation occurred.  <u>Greer v. Miller</u>, 483 U.S. 756, 766 n.8 (1987); <u>Darden</u>, 477 U.S. at 181-82 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair because curative instructions were given by the trial judge).

Other factors which the court may take into account in determining whether prosecutorial misconduct rises to the level of a due process violation are (1) the weight of the evidence of guilt,

30

see United States v. Young, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972); and (4) whether the prosecutor's comment misstated or manipulated the evidence, see Darden, 477 U.S. at 182.

In closing arguments, the prosecution must be allowed "to strike hard blows based on the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996). "A court should not lightly infer that a prosecutor intend[ed] an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974).

Under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved upon appeal. People v. Fosselman, 33 Cal. 3d 572, 580-81 (1983). A petitioner who fails to observe a state's "contemporaneous objection" rule may not challenge the constitutionality of the conviction in federal court. Engle v. Isaac, 456 U.S. 107, 129 (1982). A petitioner is not barred and therefore does not have to show cause and prejudice, however, when a reviewing state court overlooks the procedural default and considers the claim on the merits. Thomas v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2002), overruled on other grounds by Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002) (en banc).

1

United States District Court
For the Northern District of California

Petitioner argues that the prosecutor committed misconduct in his closing argument by alluding to the absence of defense evidence or explanation about the whereabouts of Petitioner's truck and Petitioner's whereabouts at the time of Trigueros's murder. Specifically, the prosecutor noted that, although there was "talk about" how Petitioner's truck "breaks down all of the time," there was "no evidence that it broke down" because no witness came and said, "oh, yeah, I was with Paul and it broke down, you know, and we took it out to the Ramirez brother[s'] ranch." People v. Zapata, H030016 at 27. Regarding Petitioner's lack of an alibi, the prosecutor told the jury:

> Let's be real clear on that. We don't know where [Petitioner] was at the time of the shooting.
>
> The [defense] didn't bring in [a] witness to tell us that he was sitting with me at 2:03 in the morning, do we? And the defense didn't put on a witness, an alibi witness, to say, hey, he was with me in San Jose, he was with me in Hollister. We don't know where he was. Oh, yeah, we do. He was at the 7-Eleven on Leavesley killing Juan Trigueros.

4 RT 976.

Citing Griffin v. California, 380 U.S. 609 (1965) and California cases, Petitioner contends these remarks violated the rule that a prosecutor must not comment upon a defendant's failure to testify, which would be a violation of his Fifth Amendment right to remain silent. Petitioner contends that, although the prosecutor did not specifically comment on his failure to testify, the prosecutor implicitly drew the jurors' attention to that failure because he was likely the only person who would have personal knowledge of his whereabouts on the night of the murder.

32

United States District Court
For the Northern District of California

In _Griffin_, 380 U.S. at 611-15, the Court ruled that prosecutors may not comment on the defendant's failure to testify because it might penalize the defendant for exercising his right to remain silent.   Although a direct comment about the defendant's failure to testify violates _Griffin_, a prosecutor's indirect comment violates _Griffin_ only "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." _Hovey v. Ayers_, 458 F.3d 892, 912 (9th Cir. 2006); _also see_, _United States v. Castillo_, 866 F.2d 1071, 1083 (9th Cir. 1988) (prosecutor may properly comment upon defendant's failure to present witnesses so long as it is not phrased to call attention to defendant's own failure to testify). Even if the prosecutor's statements violate _Griffen_, "reversal is warranted only where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." _Hovey_, 458 F.3d at 912.

The California court of appeal looked at each of the cases Petitioner cited and concluded that he overstated the breadth of their holdings.   The appellate court stated:

> We do not believe the prosecutor here ran afoul of _Griffin_ as applied in these cases.   The challenged comments drew attention to the lack of defense evidence that defendant's pickup was actually broken down after the shooting, and to the absence of any evidence of defendant's whereabouts when the shooting took place.   The first point scarcely even hints at _Griffin_ error since if defendant's truck was in fact broken down, there might be any number of witnesses who could so testify.   The second point has more substance because a defendant may indeed be the sole witness to his whereabouts _if he is alone_.

33

> But there was no reason to suppose that
> defendant was alone.  He had left the party with
> another OSP member, whom he was supposedly
> giving a ride to work.  But, assuming he dropped
> that member off before the shooting, there was
> no reason to suppose that he spent the rest of
> the evening in solitude.  There was simply no
> reason to assume that defendant was the only
> witness to his whereabouts at that time.
> Drawing attention to the absence of alibi
> evidence was therefore not an impermissible
> comment upon defendant's own failure to testify.

<u>People v. Zapata</u>, H030016 at 29 (emphasis in original).

As found by the court of appeal, the prosecutor's remarks about the lack of defense evidence regarding the whereabouts of Petitioner's pickup truck does not implicate <u>Griffin</u> because other witnesses could have testified to this and, thus, Petitioner's lack of testimony was not implied.  Similarly, the prosecutor's remarks about Petitioner's whereabouts at the time of the murder were directed at his lack of one or more alibi witnesses, not at the fact that Petitioner did not testify.  As stated by the court of appeal, because another witness could have been with Petitioner at that time, Petitioner's testimony was not needed to establish his whereabouts.  Furthermore, the trial court gave the standard jury instructions on the presumption of innocence and the defendant's privilege against self-incrimination.  And, as discussed below regarding prejudice, the evidence against Petitioner was strong and, thus, these remarks did not have a substantial or injurious effect on the outcome of the trial.

Accordingly, the state appellate court's denial of this claim was not unreasonable.

**2**

**United States District Court**
For the Northern District of California

1   Petitioner argues that the prosecutor committed misconduct

2   by arguing that Petitioner's gang membership and prior attacks on

3   Sureños made him predisposed to carry out Trigueros's murder.   The

4   allegedly improper statements are as follows:

5           The law does not undertake to measure in units
            of time the length of the period during which
6           the thought must be pondered before it can ripen
            into an intent to kill which is truly deliberate
7           and premeditated.  Time will vary with different
            individuals and varying circumstances.  And that
8           basically means that a person who has spent his
            whole life basically doing one thing and that's
9           what the evidence [is] in this case.  The
            defendant's whole life is about OSP.  There's no
10          evidence that he's captain of the softball team
            or is a high school football pitcher--or
11          baseball pitcher.  His life is about OSP and you
            heard all about that.  And you can consider that
12          in deciding whether or not this is first degree.
            [Petitioner] has been premeditating the murder
13          of Eighth Street Sureños for years.  You heard
            all that evidence, and I'll talk about that in a
14          minute.  If you're an innocent person or just a
            regular person, not a gang member or violent
15          gang member, it may take you longer to
            premeditate, and that's what this is talking
16          about.  The true test is not the duration of
            time but rather the extent of the reflection of
17          cold, calculated judgment and decision may be
            arrived at in a short period of time, but a mere
18          unconsidered and simple impulse, even though it
            includes the intent to kill, is not pre--or
19          deliberated or premeditation as will fix an
            unlawful killing as murder in the first degree.
20          And, again, this gives you something to go by
            again.  And we all know it's [Petitioner] has
21          premeditated murder, has premeditated on Eighth
            Street members, premeditated attacks on Mexican
22          nationals for years.  He's predisposed to that,
            and you can take that into consideration.
23
    4 RT 798-99.
24
            Petitioner also objects to the following statement in the
25
    prosecutor's rebuttal closing argument:
26
            We all know about the attacks and crimes against
27          Eighth Streeters and Mexican nationals.  His
            motive is so great to attack these types of
28          people he's willing to beat up a 53 year old

                                    35

United States District Court
For the Northern District of California

> Mexican national.  He's willing to discharge a
> gun at an Eighth Street Sureño in '97.  He's
> willing to boot kick a Mexican national in '98
> in the head.  That's his intent when it comes to
> dealing with people like Juan Trigueros and
> that's his motive and that's something you can
> use to decide whether he's got the intent and
> motive to do these things and he does.

4 RT 991-92.

The state appellate court acknowledged that the prosecutor, by saying that Petitioner was "predisposed" to committing crimes against Mexican nationals, came close to violating the rule against using character evidence to show that the defendant was predisposed to committing the charged crime.  However, the appellate court denied the claim, based on the following reasoning:

> We are uncertain that this statement, closely
> parsed, was an inaccurate characterization of
> the law.  The vice at which the rule against
> character evidence chiefly aims is a direct
> inference of guilt based upon a defendant's
> apparent predisposition to commit crimes of the
> type charged.  With one exception, the arguments
> challenged here all *assumed* that defendant
> killed Juan Trigueros; his predisposition to
> inflict violence of [sic] persons like Trigueros
> was argued as a basis not to identify defendant
> as the killer but to infer a particular element
> of the offense, i.e. intent or premeditation.
> The one exception was motive, the apparent
> argument here being that defendant's manifest
> hatred of persons like Trigueros constituted a
> motive to kill him, which in turn supported
> several incriminating inferences, including that
> it was indeed defendant who committed this
> seemingly pointless killing.  Any inaccuracy in
> the argument appears too slight to prejudice
> defendant, particularly since the jury was
> plainly instructed *not* to draw an inference of
> guilt from predisposition.

People v. Zapata, H030016 at 30-31 (emphasis in original).

Citing McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993) and other pre-AEDPA cases, Petitioner argues that the appellate court's decision was unreasonable because it ignored the general rule that

United States District Court
For the Northern District of California

1  evidence of a person's character may not be offered to prove his
2  conduct on a specific occasion.

3          The use of character evidence to show propensity to commit
4  a specific crime is not allowed because it would allow the jury to
5  base its verdict on emotion and not the evidence.  Id. at 1384.
6  However, the admission of other crimes evidence violates due process
7  only where there are no permissible inferences the jury can draw
8  from the evidence.  Id.  It is generally upheld where: (1) there is
9  sufficient proof that the defendant committed the prior act; (2) the
10 prior act is not too remote in time; (3) the prior act is similar
11 (if admitted to show intent); (4) the prior act is used to prove a
12 material element; and (5) the probative value of admitting evidence
13 of the prior act is not substantially outweighed by any prejudice
14 the defendant may suffer as a result of its admission.  McDowell v.
15 Calderon, 107 F.3d 1351, 1366 (9th Cir. 1997), vacated in part by
16 130 F.3d 833, 835 (9th Cir. 1997) (en banc).

17         In post-AEDPA habeas cases, the Ninth Circuit has held
18 that, based on the Supreme Court's reservation of this issue in
19 Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) as an "open
20 question," a petitioner's due process right concerning the admission
21 of prior crimes to show propensity for criminal activity is not
22 clearly established under 28 U.S.C. § 2254(d) and therefore cannot
23 form the basis for federal habeas relief.  Larson v. Palmateer, 515
24 F.3d 1057, 1066 (9th Cir. 2008).

25         Therefore, Petitioner's claim that the propensity evidence
26 was admitted improperly is not cognizable on habeas review.  Even if
27 it were, the claim would be denied on the ground that the evidence
28 was admissible to establish intent, a material element of the

United States District Court

For the Northern District of California

prosecutor's case regarding premeditation.  Furthermore, there was sufficient proof that Petitioner committed the prior acts, they were not remote in time from the charged crime and they were similar to the charged crime in that they all involved attacks on Mexican nationals.  Therefore, it was reasonable for the appellate court to conclude that it was proper for the prosecution to argue that the prior bad acts evidence showed that Petitioner had the intent to kill Trigueros, a young Hispanic male who wore the number 8 in Norteño territory.  The fact that the prosecutor once used the word, "predisposed," in the middle of this argument does not demonstrate prosecutorial misconduct.

Accordingly, the appellate court's denial of this claim was neither contrary to nor an unreasonable application of Supreme Court authority.

3

Petitioner argues that the prosecutor improperly mentioned in his closing argument that Sanchez had asserted her Fifth Amendment privilege against incriminating herself during her testimony because it invited an improper inference that her testimony for the prosecution was credible.  Petitioner argues that this is misconduct because a prosecutor may not express a personal opinion about or vouch for the credibility of any witness's testimony.

On direct examination, the prosecutor asked Sanchez whether she had "ever helped OSP" during the gang's early years.  2 RT 442.  Sanchez replied, "I don't know.  I'm--that I'm not going to answer.  I won't answer that because I'm not going to incriminate myself."  2 RT 442.  In his closing argument, the prosecutor

referred to this exchange when discussing Petitioner's reason for
asking Sanchez to drive his truck to the home of Sparkie in
Stockton:

> [W]ho can you trust?  Do you want [an] OSP male
> gang member to drive that car to Rico's house?
> No.  Why?  Because they're looking for a white
> pickup truck.  Once an OSP gang member gets
> pulled over in a white pickup truck you're in
> trouble.  Who is the best person to ask to drive
> that?  Sarah [Sanchez].  Because [Sanchez] has a
> history of helping OSP.  Do you remember that?
> In '97 she's helping hide those guys.  The
> testimony came out when I asked her have you
> done favors for OSP.  She said I don't want to
> incriminate myself.  Okay.  She's a player at
> that point.  She's somebody they can trust.
> She's friends with [Petitioner].  She's the
> perfect person to drive that car to Rico's
> house.

4 RT 822.

The state appellate court agreed that the prosecutor
committed misconduct by inviting an improper inference from
Sanchez's invocation of the Fifth Amendment.  The court also found
it improper because it invited the jury to treat unanswered
questions as substantive evidence.  However, the court found that
Petitioner suffered no prejudice from the prosecutor's improper
argument because there was no reasonable possibility that it
effected the outcome of the trial.  The court's conclusion was based
on the fact that Sanchez's invocation of the Fifth Amendment was
surrounded by her testimony that she hung around with the OSP, was
friendly to is members, sometimes did them favors and she affirmed
that she was somebody they could rely on.  The court concluded that:

> The whole subject of her relationship to the
> gang was peripheral to the case.  That her
> involvement rose to levels of criminal
> culpability, even if shown, would add nothing of
> measurable substance to the case against
> defendant.  Thus, her constitutionally protected

United States District Court
For the Northern District of California

1

> unwillingness to testify about any "help" she
> rendered to the gang, even if improperly viewed
> by the jury as evidence that she rendered help
> of a criminal nature, can have no conceivable
> effect on the jury's assessment of defendant's
> guilt.

2

3

4

<u>People v Zapata</u>, H030016 at 31-32.

5

A prosecutor may not vouch for the credibility of a

6

witness. <u>United States v. Moreland</u>, 622 F.3d 1147, 1161 (9th Cir.

7

2010); <u>United States v. Lopez</u>, 803 F.2d 969, 973 (9th Cir. 1986)

8

(improper to suggest that witness found credible by the grand jury

9

should therefore be credible to the trial jury). Improper vouching

10

for the credibility of a witness occurs when the prosecutor places

11

the prestige of the government behind the witness or suggests that

12

information not presented to the jury supports the witness's

13

testimony. <u>United States v. Young</u>, 470 U.S. 1, 7 n.3, 11-12 (1985).

14

Petitioner's argument that the prosecutor's reference to

15

Sanchez's invocation of her privilege against self-incrimination

16

constituted vouching is unpersuasive. As indicated by the appellate

17

court, the prosecutor was using Sanchez's invocation of the

18

privilege as evidence that she was involved in criminal gang

19

activity and, thus, would have been seen by Petitioner as a

20

trustworthy person to ask to hide his pickup truck. As reasonably

21

concluded by the appellate court, this did not add anything to what

22

the jury already knew--that, at some time in the past, Sanchez was

23

involved with, and did favors for, members of the OSP gang.

24

Therefore, the state appellate court reasonably concluded that, even

25

though the prosecutor's statement was improper, it did not prejudice

26

Petitioner.

27

**4**

28

United States District Court
For the Northern District of California

Petitioner argues that the prosecutor committed misconduct by implying that the defense had the burden of producing evidence establishing a reasonable doubt of Petitioner's guilt.

In discussing reasonable doubt in his closing argument, the prosecutor first read to the jury the standard reasonable doubt instruction, and then stated:

> What it breaks down to is that you can speculate about a lot of things, you can guess about a lot of things, but unless they're based on evidence ignore them.  There's got to be some connection to the evidence.  Everything relating to human affairs is open to some possible or imaginary doubt, right.  So if the standard was, well, I have a doubt[,] you could never convict anybody because you're always going to have a doubt.  And I guarantee you, and the evidence is very strong in this case, it should be a relatively easy case for you to decide with all this evidence.  But somebody is going to get back there an[d] say I have a doubt, you know, something is bothering me here or I just have this feeling.  Well, when they say that, the best way to address that is[,] is your doubt based on the evidence or are you speculating or are you guessing at something, and that's the best way to look at that.

4 RT 807-08.

In his closing rebuttal, the prosecutor stated:

> Defense attorney wants you to look at reasonable doubt like it's some kind of chain.  Like if I can explain one thing away the chain breaks and you have reasonable doubt.  No.  And what have I been talking about throughout this whole trial?  You look at all the evidence at the same time.  You look at everything.  Line them all up and you look at them together, because the facts that are true will support each other.  Reasonable doubt is not a chain; it's a rope.  Every piece of evidence that supports Sarah Valdez's statement about [Petitioner's] confession of the murder.  Every piece of evidence an extra strand is put in that rope.  Every piece makes that rope bigger and stronger.  So if the defense is able to explain one strand of the rope away, that rope still holds because

41

you have many other strands holding it together.
You look at all the evidence.

4 RT 978-79.

The state appellate court concluded that the prosecutor's statements did not shift the burden of proof, but may have improperly suggested to the jury that, unless a doubt is supported by some affirmative evidence, it is not reasonable and does not warrant acquittal.  However, the appellate court found that the prosecutor's statements were ambiguous because the jury could have interpreted them to mean that it should account for the evidence in evaluating any doubts or that a doubt must be demonstrated by some affirmative evidence.  The first interpretation would be proper, while the latter interpretation would not.  The court held that the ambiguity was unlikely to cause the jury to misapply the law because the jury received several relevant admonitions in its instructions regarding reasonable doubt, the presumption of innocence, and the prosecution's burden to prove guilt beyond a reasonable doubt.  The jury was also instructed that the defendant could choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charged crimes and that "[n]o lack of testimony on the defendant's part will make up for a failure of proof by the People so as to support a finding against him on any essential element." People v. Zapata, H030016 at 34.

The appellate court concluded that, "while the prosecutor's remarks concerning reasonable doubt were misconduct, they were comparatively mild and unlikely to lead the jury into

misunderstanding or misapplying the relevant law." <u>People v.</u>
<u>Zapata</u>, H030016 at 34.

A prosecutor's mischaracterization of a jury instruction
is less likely to render a trial fundamentally unfair than if the
trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a
> jury than do instructions from the court.  The former are
> not evidence, and are likely viewed as the statements of
> advocates; the latter, we have often recognized, are
> viewed as definitive and binding statements of the law.
> Arguments of counsel which misstate the law are subject to
> objection and to correction by the court.  This is not to
> say that prosecutorial misrepresentations may never have a
> decisive effect on the jury, but only that they are not to
> be judged as having the same force as an instruction from
> the court.

<u>Boyde v. California</u>, 494 U.S. 370, 384-85 (1990).

The appellate court's conclusion was not unreasonable.
Although the prosecutor misstated the law in regard to reasonable
doubt, before he gave the jury his interpretation of the
instruction, he quoted the actual instruction.  Thus, the jury heard
the correct instruction on reasonable doubt from the prosecutor
himself and then heard the instruction from the court.  Further, in
context of the other jury instructions explaining reasonable doubt
and the burden of proof, it is unlikely the jury misunderstood the
correct instruction or misapplied it.  Therefore, the state
appellate court's denial of this claim was not contrary to or an
unreasonable application of established federal authority.

5

Petitioner contends the prosecutor committed misconduct by
encouraging the jurors to speculate about the victim's subjective
experience in the moments before he died because the comments were

not supported by evidence and because they inflamed the passions of the jury.

The prosecutor began his closing rebuttal argument as follows:

> I want to show you guys a picture [sic] Juan
> Trigueros, early morning hours May 19th, 2001.
> He can't get that second tire fixed.  He had
> been drinking beer probably four hours after his
> friend Magdaleno Cervantes left him.  Pretty sad
> and lonely situation to be in.  He gets that car
> over [to the] 7-Eleven to use the pay phone.  He
> calls his girlfriend.  On the phone call 15, 20
> minutes. . . . Picture, if you will, the last
> words that Juan Trigueros heard before the
> defendant shot him in the back and to make sure
> he was dead shot him in the chest.  What were
> the last things he heard?  What's the reasonable
> inference of what was going on that precise
> moment the second before he's mortally wounded?
> Fuckin' scrap.  You fuckin' wetback.  Can you
> imagine the terror and the fear of Juan
> Trigueros must have felt as he's cowering into
> the phone as Puphal told you kind of bending
> into the phone to try avoid this person, to not
> have any issue, to just try get home and lead
> his life.  Fuckin' scrap.  Wetback.  He died
> because he was born in Mexico and he made the
> mistake of wearing a number 8 jersey on
> Leavesley Avenue in the city of Gilroy and made
> the mistake of being at 7-Eleven the same night
> the defendant was partying five blocks away.
> What a way to exit the world.

4 RT 964-65.

The prosecutor repeated this theme twice in later portions of his rebuttal.

A prosecutor may not urge the jurors to convict in order to protect community values, preserve civil order, or deter future lawbreaking.  <u>United States v. Sanchez</u>, 659 F.3d 1252, 1256 (9th Cir. 2011).  The vice in such an argument is that it increases the possibility that the defendant will be convicted for reasons unrelated to his own guilt.  <u>Id.</u> at 1256-57.  A prosecutor's

44

**United States District Court**
For the Northern District of California

"testifying" in the voice of the victim about the circumstances of his killing was misconduct because he "risked improperly inflaming the passions of the jury through his first-person appeal to its sympathies for the victim . . ." <u>Drayden v. White</u>, 232 F.3d 704, 711-13 (9th Cir. 2000).

The state appellate court found that the racial epithets that the prosecutor used were speculation and inflammatory and "wholly extraneous to any issue properly before the jury. . . . The prosecutor could have no reason for mentioning it other than to inflame the jury's sentiments. . . . By deliberately drawing the jury's attention to that irrelevant and improper consideration, the prosecutor committed serious misconduct." <u>People v. Zapata</u>, H030016 at 36-37. However, the court found that this claim was not available on appeal because defense counsel had not objected to these remarks. The court thus looked at whether counsel was ineffective for failing to object and found that the record did not suggest any tactical reason for not objecting. However, the court determined counsel was not ineffective because the evidence was strong and, therefore, it was "highly unlikely that the jury was influenced by the prosecutor's improper argument as opposed to the other strong evidence of defendant's guilt." <u>People v. Zapata</u>, H030016 at 38.

Even though this claim was procedurally defaulted on direct appeal, because the appellate court addressed it, this Court is not barred from reviewing it. See <u>Thomas</u>, 273 F.3d at 1176. Based upon <u>Drayden</u>, the state appellate court correctly decided that these remarks by the prosecutor had no purpose other than to inflame the passion of the jury and, thus, constituted misconduct. Further,

45

United States District Court

For the Northern District of California

1   as found by the appellate court, because there was no reason for
2   counsel not to object to this misconduct, his failure to do so
3   constituted deficient performance.

4          However, the state appellate court found that counsel's
5   deficient performance was not prejudicial because it was not
6   reasonably probable that a result more favorable to Petitioner would
7   have been reached but for the misconduct.  The finding of no
8   prejudice was reasonable.  Support for this conclusion is found in
9   Drayden.  In that case, the prosecutor's comments were more
10  extensive and inflammatory than those of the prosecutor here, but
11  the court denied habeas relief because: (1) the prosecutor's
12  statements had been supported by reasonable inferences from the
13  evidence; (2) the trial court had instructed the jury that
14  "[s]tatements made by the attorneys during the trial are not
15  evidence" and the jury "must not be influenced by mere sentiment,
16  conjecture, sympathy, passion, prejudice, public opinion or public
17  feeling;" and (3) the evidence of the defendant's guilt was very
18  strong.  232 F.3d at 713-14; see also Fields v. Woodford, 309 F.3d
19  1095, 1109 (9th Cir. 2002) (finding no prejudice from prosecutor's
20  statement, in closing argument, asking jurors to think of themselves
21  as the victim and describing crime from victim's perspective).
22  Here, except for the prosecutor's racial epithets, his statements
23  were supported by reasonable inferences from the evidence, the jury
24  was given the same standard jury instructions as those cited in
25  Drayden, see 5 RT 1057-58, and, as discussed below in the section on
26  prejudice, the evidence against Petitioner was strong.

27         Citing Donnelly, 416 U.S. at 644, Petitioner argues that,
28  because the jury was not instructed to disregard the prosecutor's

46

United States District Court
For the Northern District of California

improper remarks, the jury thought the remarks were proper and considered them.  Although in <u>Donnelly</u>, the Court gave great weight to the curative instruction to determine that the prosecutor's remark was not prejudicial, the Court also stated, "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. . . . [Thus,] the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions.  Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process."  <u>Id.</u> at 645.  Here, although there was no specific curative instruction, there were instructions that specifically told the jury it was not to consider argument by counsel as evidence and that the jury must not be influenced by sentiment, passion or prejudice.  As discussed above, in <u>Drayden</u>, the Ninth Circuit found that these instructions were sufficient to inform the jury that it should not consider the prosecutor's improper remarks in its deliberations.  232 F.3d at 713.

Therefore, the appellate court's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority.

6

Petitioner contends that the prosecutor improperly argued to the jury that Echeverria's laughter upon seeing the police sketch

**United States District Court**
For the Northern District of California

1  of the suspected killer was a "spontaneous statement" and, thus, was

2  a reliable sign of recognition.

3          The prosecutor's comment was based on Detective Zen's

4  testimony that, when he showed Echeverria the police sketch, "she

5  laughed or chuckled to herself."  2 RT 548-49.  He asked her why she

6  was laughing and she replied, "something to the effect of, oh, yeah,

7  that's when [Petitioner] was trying to grow a goatee."  2 RT 549.

8  When commenting on this evidence in his closing argument, the

9  prosecutor said:

10              And you've got Nancy Echeverria's statement.
             It's real interesting.  If you think about how
11            it was taken.  Look at this?  Remember she said
             on that tape it looks just like him.  It does
12            look just like him.  She also--she laughs.
             Laughs like she remembered something, not laughs
13            like I'm making something up.  What's with the
             laughs?  These spontaneous statements are
14            interesting.  The law recognizes spontaneous
             statements as being accurate and more truthful
15            because you don't have time to reflect on that.
             Look at this.  Ha ha, oh, yeah, that's when he
16            was trying to grow that scraggly black goatee.
             Looks just like him.
17
18   4 RT 985.

19          The state appellate court agreed that the prosecutor was

20  incorrect in labeling laughter a spontaneous statement because

21  laughter is not a "statement" and, thus, falls outside the hearsay

22  rule where the concept of "spontaneous declaration" belongs.

23  However, the court found that this was not misconduct because the

24  prosecutor was correct in substance in that the spontaneity of a

25  declaration is thought to make it reliable and the spontaneity of

26  Echeverria's laughter would impart to it a similar sign of

27  reliability.

28

United States District Court
For the Northern District of California

1    Petitioner argues that, because Echeverria first saw the

2  police sketch of the suspect about two to three weeks after the

3  murder in the window of a local store, see 2 Rt 386-87, when

4  Detective Zen showed her the sketch months later, her reaction could

5  not be called "spontaneous."  The fact that Echeverria had seen the

6  sketch sometime before Detective Zen showed it to her, does not make

7  her initial reaction to seeing it a second time months later any

8  less "spontaneous."  Furthermore, based on Detective Zen's version

9  of how Echeverria reacted, the prosecutor's characterization of her

10 laughter as similar to a spontaneous statement was not such an

11 inaccurate statement of the law as to make it misconduct.

12 Therefore, the state appellate court's denial of this claim was not

13 unreasonable.

14                                    **7**

15    Petitioner argues that, in his closing argument, the

16 prosecutor misstated evidence about Petitioner getting a gun after

17 he saw Trigueros in the phone booth and about the relative heights

18 of Trigueros and the shooter.

19    The prosecutor engages in misconduct when he makes

20 statements to the jury during closing argument which he knows are

21 false, or has very strong reason to doubt, with respect to material

22 facts on which the defendant's defense relied.  United States v.

23 Reyes, 577 F.3d 1069, 1078 (9th Cir. 2009).

24    Petitioner first objects to the following statement:

25     Again, premeditation, arming yourself with a
       gun.  You're premeditating you're going to use
26     that gun.  You put a gun in your pocket and go
       to 7-Eleven where you see a Mexican national at
27     7-Eleven wearing a Kobe Bryant number 8 jersey
       and you go back and get a gun and come back to
28

                                    **49**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> assault him.  You're premeditating the use of
> that gun, and that's in evidence.

4 RT 799-800.

Petitioner contends that there was no evidence that he had deliberately obtained a gun after observing Trigueros at the 7-Eleven and so the prosecutor's statement was misleading regarding premeditation.  The appellate court summarily denied this claim by relying on the fact that the jurors were instructed that statements of counsel were not evidence and that they should be guided in all matters by the evidence that was actually admitted.

The evidence was that, after Petitioner saw Trigueros, he yelled and waved his arms for several seconds and then shot him twice at point blank range, without provocation from Trigueros.  This evidence established premeditation, no matter how the prosecutor described how Petitioner got the gun.  Therefore, the prosecutor's statement did not influence the outcome of the verdict.

Petitioner next objects to the prosecutor's following statement:

> [Defense attorney] said something about that the
> shooter was shorter than Juan Trigueros.  Where
> did that come from?  There was a measurement of
> the victim Juan while he's on the slab at the
> corner's [sic] office.  But was there ever
> testimony that, yeah, the shooter was shorter or
> taller?  No, there wasn't, because I've got that
> same transcript, folks, that the defense
> attorney held up here.  I've got it, too, and
> there's nothing in here about that.  That's just
> a complete misstatement about what the law is.
> He never said that [Petitioner] is three inches
> shorter than Juan Trigueros.  That's just not in
> the record in any place, not correct and not
> true.  I'm not saying he's misrepresenting
> intentionally.  He's just wrong.

4 RT 970.

50

**United States District Court**
For the Northern District of California

1    Petitioner contends this was a misstatement of the
2    evidence because, on the night of the crime, Puphal described the
3    shooter to the police as standing about five feet five inches tall
4    and weighing between 140 to 150 pounds.

5    Petitioner accurately describes Puphal's description on
6    the night of the murder.  However, at trial, Puphal described the
7    shooter as standing between five feet five to five feet eight inches
8    and weighing between 150 and 175 pounds.  Also, on the night of the
9    murder, Shell station attendant Joseph Morton testified that the man
10   he saw walking away from the 7-Eleven after the shooting was five
11   feet ten to six feet tall, weighing 180 to 200 pounds.  In his
12   closing argument, defense counsel repeatedly argued that Petitioner
13   could not have been the shooter because he did not match the height
14   or weight estimates of Morton or Puphal, implying that Puphal had
15   testified that the shooter was only five feet five inches tall.

16   Because there was some evidence that the shooter was only
17   five feet five inches tall, but not definitive testimony that the
18   shooter was "at least three inches shorter than the victim," the
19   prosecutor reasonably could correct defense counsel's statement.
20   Furthermore, as found by the state appellate court, the jury was
21   instructed that the attorneys' statements were not evidence, and
22   they had heard the testimony regarding the shooter's height and
23   weight.  Thus, the prosecutor's statement was not improper nor was
24   it prejudicial.

25                                    8

26   Petitioner argues that the prosecutor improperly offered
27   his own testimony regarding the registration records for
28   Petitioner's pickup truck.  In discussing the registration records

United States District Court
For the Northern District of California

1  for the truck in his closing argument, the prosecutor noted that the
2  initial registration expired on October 31, 2001, that no additional
3  fees were paid until June 2002, when the truck was re-registered in
4  the name of Rachel Reyes and that this supported the theory that
5  Sparkie had been holding the truck for Petitioner in Stockton from
6  the time of the shooting until June 2002.  4 RT 988.  Petitioner
7  argues that this was improper because, although the records were
8  admitted into evidence, there was no testimony that the truck
9  registration expired in October 2001.

10      The state appellate court denied this claim, noting that
11 the jury was instructed that statements of counsel were not evidence
12 and that they should be guided only by the evidence that was
13 admitted.  The state court's denial of this claim was not
14 unreasonable.  The prosecutor's statement regarding the registration
15 record was brief and not critical to the case.  Furthermore, the
16 jury had the records and could draw their own inferences based on
17 them.  Therefore, the appellate court's denial of this claim was not
18 unreasonable.

19                                    D

20      Petitioner argues that the trial court erred by refusing to
21 give an instruction, as requested by counsel, that, if Petitioner
22 had killed Trigueros in the heat of passion as a result of
23 provocation, he could not be guilty of murder but only of the lesser
24 included offense of voluntary manslaughter.  Petitioner contends
25 that this instruction was supported by Puphal's testimony that, when
26 he first approached the 7-Eleven, he had seen two people who were
27 very upset with each other.

28      In <u>Solis v. Garcia</u>, 219 F.3d 922, 928-29 (9th Cir. 2000),

                                    52

the Ninth Circuit held that a state trial court's failure to
instruct the jury on lesser included offenses in a non-capital case
does not present a federal constitutional question and is,
therefore, not cognizable on federal habeas review.  Furthermore,
even if this Court could review this claim it would be denied
because the state court appellate court's finding that there was
insufficient evidence to support a jury instruction on voluntary
manslaughter based on provocation was not an unreasonable
determination of the facts in light of the record evidence.
Therefore, habeas relief on this ground is denied.

E

Finally, Petitioner argues that his counsel was
ineffective for failing to request a jury instruction which would
have explained how provocation can reduce a charge of first degree
murder to second degree murder.  The state appellate court denied
this claim on the ground that there was no evidence of provocation
and, thus, even if the instruction were included, there was no
realistic possibility that it would have changed the jury's verdict.

The state court's denial of this claim was not an
unreasonable determination of the facts in light of the record
evidence.  Therefore, habeas relief on this ground is denied.

F

1

To determine prejudice from ineffective assistance of
counsel, the appropriate question is "'whether there is a reasonable
probability that, absent [counsel's] errors, the factfinder would
have had a reasonable doubt respecting guilt.'"  Luna v. Cambra, 306
F.3d 954, 961 (9th Cir. 2002), amended by 311 F.3d 928 (9th Cir.

53

United States District Court
For the Northern District of California

2002) (quoting <u>Strickland</u>, 466 U.S. at 695). If the state's case is weak, there is a greater likelihood that the result of the trial would have been different, and vice versa. <u>Luna</u>, 306 F.3d at 966-67. "'[P]rejudice may result from the cumulative impact of multiple deficiencies.'" <u>Harris v. Wood</u>, 64 F.3d 1432, 1438 (9th Cir. 1995).

To show prejudice as a result of prosecutorial misconduct, a petitioner must show that the misconduct had a substantial and injurious effect or influence in determining the jury's verdict, <u>Brecht</u>, 507 U.S. at 637-38, and that the trial was infected with unfairness. <u>Darden</u>, 477 U.S. at 181.

2

Petitioner argues that this was a close case and, thus, any misconduct on the part of counsel or the prosecutor was likely to change the result of the trial or have a substantial and injurious effect or influence in determining the jury's verdict. The state appellate court acknowledged that the prosecution's case was hampered by weaknesses in the identification evidence, but otherwise found that there was a strong case against Petitioner. The following supports the state court's finding of fact.

First, the universe of likely suspects was effectively confined to OSP members by the absence of any explanation for the crime other than gang-related hatred and the significance of the number 8 to OSP. There was evidence that, on the night of the murder, Petitioner was at a party a few blocks away from the 7-Eleven. Significant evidence supported the finding that Petitioner's pickup was involved in the shooting. Notably, eye-witness Davila identified Petitioner's truck from the damage to the right side tires, which he said would be there because, on the night

54

United States District Court
For the Northern District of California

of the murder, the truck hit a traffic island with its right-side tires when driving away from the murder scene.  The involvement of Petitioner's pickup made it extremely likely that Petitioner was the shooter or the driver.  Because there was evidence that Petitioner was not a good driver, it was likely that, if he and another person decided to confront a perceived Sureño, he would relinquish the driving to his companion.  The similarities between Petitioner's face and the police sketch meant that the gunman was either Petitioner or another OSP member who also resembled the sketch.  As pointed out by the state appellate court, these facts, which were not dependant on the testimony of any witness who had a motive to lie, pointed strongly to Petitioner as the gunman.

Furthermore, Sarah Sanchez directly incriminated Petitioner by testifying that he said to her that he "shot up" the 7-Eleven.  She admitted that Petitioner was one of two OSP members toward whom she harbored ill will for attacking her and her new boyfriend.  It was shortly after the attack that she told the police about Petitioner's statement to her about his involvement in the 7-Eleven shooting.  The defense attacked her for making up lies to incriminate Petitioner out of revenge.  However, her anger at Petitioner also could be interpreted as motivating her to forego the silence that gang loyalty required so that she could tell the truth about Petitioner's statement, rather than to make up a story about Petitioner.  The jury heard the evidence that put her credibility at issue and chose to believe her.

The same is true for Nancy Echeverria, who told Detective Zen that she thought Petitioner was the shooter because his car disappeared the day after the shooting, the police sketch looked

United States District Court
For the Northern District of California

like him and he was wearing the same clothes worn by the shooter as described by the eyewitnesses.  The defense elicited testimony that she was angry at Petitioner for cheating on her with other women. The jury heard this and either chose to believe her even though her credibility was questionable or found that the evidence without her testimony was sufficient to find that Petitioner was guilty.

The jury only deliberated three hours to convict Petitioner as charged with first degree murder and the gang-related allegation, even though the trial lasted more than two weeks.  <u>See</u> <u>United States v. Lopez</u>, 500 F.3d 840, 846 (9th Cir. 2007) (length of jury deliberations an indicator of whether case was strong or weak); <u>United States v. Velarde-Gomez</u>, 269 F.3d 1023, 1036 (9th Cir. 2001) (four-day jury deliberations weighed against finding of harmless error because lengthy deliberations suggest a difficult case).  The short time the jury spent deliberating indicates that it thought the case against Petitioner was strong.

It follows that there was no reasonable probability that, absent counsel's errors, the jury would have had a reasonable doubt respecting guilt or that the prosecutor's misconduct had a substantial and injurious effect or influence in determining the jury's verdict or infected the trial with unfairness.

V

For the foregoing reasons, the Petition for a Writ of Habeas Corpus is DENIED.

A Certificate of Appealability is granted, in part.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly

**United States District Court**

For the Northern District of California

1  known as a certificate of probable cause to appeal).  28 U.S.C.

2  § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate

3  of appealability "only if the applicant has made a substantial

4  showing of the denial of a constitutional right."  28 U.S.C.

5  § 2253(c)(2).  The certificate must indicate which issues satisfy

6  this standard.  Id. § 2253(c)(3).

7        Petitioner has made a substantial showing of the denial of

8  a constitutional right on the following claims: (1) ineffective

9  assistance of counsel based on (a) failing to object to Officer

10 Zamora's testimony and (b) failing to object to hearsay testimony

11 regarding Petitioner's truck; and (2) prosecutorial misconduct based

12 on (a) Griffin error; (b) statements suggesting that the defense had

13 the burden to establish reasonable doubt; (c) statements designed to

14 inflame the passions of the jury; and (d) misstatements of the

15 evidence regarding the relative heights of Petitioner and the

16 victim.  Petitioner has not made a substantial showing of the denial

17 of a constitutional right on the other claims in his petition.

18 Petitioner may not appeal the denial of a Certificate of

19 Appealability in this Court but may seek a certificate from the

20 Court of Appeals under Rule 22 of the Federal Rules of Appellate

21 Procedure.  See Rule 11(a) of the Rules Governing Section 2254

22 Cases.

23        The Clerk is directed to enter Judgment in favor of

24 //

25

26 //

27

28 //

57

Respondent and against Petitioner, terminate any pending motions as moot and close the file.

       IT IS SO ORDERED.


DATED        _09/18/2012_                                 
**THELTON E. HENDERSON**
**United States District Judge**


G:\PRO-SE\TEH\HC.10\Zapata-10-176-HCDeny.wpd