**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL MATTHEW ZAPATA,

              Petitioner,

      v.

RODOLFO VASQUEZ, Warden,

              Respondent.

_____/

No. C 10-0176 TEH (PR)

ORDER DENYING PETITION FOR WRIT
OF HABEAS CORPUS; GRANTING, IN
PART, CERTIFICATE OF
APPEALABILITY

      Pro <u>se</u> Petitioner Paul Matthew Zapata, a state prisoner
incarcerated at Pelican Bay State Prison, seeks a writ of habeas
corpus under 28 U.S.C. § 2254 to vacate his conviction after a trial
by jury.  For the reasons that follow, the Court denies the petition
and grants, in part, a certificate of appealability.

                I

      On November 2, 2004, a jury found Petitioner guilty of the
first degree murder of Juan Trigueros.  The jury also found that the
murder was committed for the benefit of a criminal street gang and
that Petitioner had personally discharged a firearm causing death.
1 Clerk's Transcript (CT) 182-83.  On April 4, 2005, the court
sentenced Petitioner to fifty years to life in prison.  2 CT 386-
388; 5 Reporter's Transcript (RT) 1111.

United States District Court
For the Northern District of California

Petitioner appealed his conviction and, on January 9, 2009, the California court of appeal, in an unpublished opinion, affirmed the judgment.  Ex. 3, <u>People v. Zapata</u>, H030016 (California Court of Appeal, January 9, 2009).  On February 13, 2009, Petitioner filed a petition for review in the California Supreme Court and, on April 3, 2009, in a one-sentence order, the Court denied review. Exs. 4 and 5.

On January 13, 2010, Petitioner filed the instant habeas petition raising the following claims: (1) erroneous admission of evidence in violation of Petitioner's rights to due process and confrontation; (2) ineffective assistance of counsel; (3) prosecutorial misconduct; and (4) erroneous jury instruction. On June 30, 2010, the Court found that these claims were cognizable and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Doc. #9.  Respondent has filed an answer and Petitioner has filed a traverse.

II

The following factual background is taken from the order of the California court of appeal and the trial transcript.

On May 18, 2001, Juan Trigueros drove from his home in Soledad to Gilroy, where he attended an electronics class.  After class, Trigueros joined a classmate, Magdaleno Barajas, for dinner and drinks.  Trigueros drank a great deal; his blood alcohol level was later measured at .18, more than twice the level for drunk driving.  While driving after dinner, Trigueros hit a curb and punctured both right-side tires.  Because he could only fix one tire and it was too late to repair or replace the second tire, his car was effectively disabled.  Barajas called a friend for a ride home,

**United States District Court**
For the Northern District of California

but Trigueros declined a ride, saying he did not want to leave his car unattended.

Trigueros was wearing a jersey with the number 8 in honor of basketball star Kobe Bryant.  An expert testified that the neighborhood in which Trigueros was stranded was claimed as turf by Outside Posse (OSP), a local clique of the Norteños street gang. The expert testified that, by wearing the number 8 in OSP territory, Trigueros made himself a "marked man."

At approximately 2:00 a.m., Trigueros called Marissa Villagomez, whom he was dating, from a phone booth in the parking lot of a 7-Eleven on Leavesley Road.  After conversing for ten to fifteen minutes, he abruptly stopped talking and the line "went dead."

At about that time, Brian Puphal was making a stop at the 7-Eleven so that a friend, whom he was driving home, could buy tobacco.  As Puphal approached the store, he saw one man, in a phone booth, talking on the telephone while another was yelling at him and "[r]aising his arms in anger."  Puphal stopped his pickup about forty feet away with its headlights pointed directly at the two men. He saw the man who was yelling pull out a pistol from his waistband and shoot the other from a distance of two to three feet.  The victim twisted, but did not fall.  The shooter fired a second shot from about six feet.  The victim staggered into the store.  The gunman looked directly at Puphal for a few seconds before running through a nearby car wash.  Shortly thereafter, a white pickup drove slowly past the 7-Eleven.  Puphal entered the store, where Trigueros was lying dead on the floor.  Puphal described the gunman to the police, and within a few days of the shooting, described him to

police sketch artist Gilbert Zamora.  Puphal was sure the shooter had a scraggly goatee.  He testified that a June 2001 photo of Petitioner "could be" the gunman.  He failed to identify Petitioner in a pretrial photographic lineup.

Joseph Morton was working at a gas station and convenience market near the 7-Eleven when he heard gunshots.  He saw a man walk "nonchalantly" from the direction of the 7-Eleven, looking backwards as though associated with the shots in some way.  The man walked about half a block in Morton's direction before getting into the passenger seat of a white pickup or SUV which quickly drove away.  Morton called 911.

Army recruiter Felipe Davila was making a purchase in Morton's convenience market when he heard "at least two" shots from what "sound[ed] like a nine millimeter."  Unable to credit this perception, he completed his transaction, which took a few seconds, then heard a screeching noise and ran outside in time to see a white truck being driven in a "crazy" manner.  It started to make a right turn, but resumed its original course after hitting a traffic island hard enough to damage the right tires.  Davila described the truck as a white pickup with a chrome bumper and "Toyota" on the tailgate in blue letters.  About a month before trial, police showed Petitioner's pickup to Davila and he said it resembled the truck he had seen on the night of the shooting.  He said that, if he was right, it should have some damage on the tires and, consistent with his statement, there was damage to the right-side tires.

Petitioner belonged to the OSP.  Evidence was received concerning several violent offenses, in which Petitioner participated, that were committed for the benefit of the OSP.  Nancy

**4**

United States District Court
For the Northern District of California

Echeverria, Petitioner's former girlfriend, testified that, on the night of Trigueros's shooting, she accompanied Petitioner to a barbecue at an OSP member's home a few blocks from the 7-Eleven. Petitioner left between 10:00 and 11:00 p.m. to drive a friend to work.

Sarah Sanchez, a former associate of OSP members, testified that, in May or June 2001, shortly after the shooting, she saw Petitioner at the Ramirez family ranch near Gilroy, where he asked her to do him a favor by driving his pickup truck to Stockton or Manteca. She asked him why, and he replied that he had shot somebody at the 7-Eleven and "needed to get rid of" the truck. She thought he was joking until some time later, when she saw a newspaper report about the shooting. In the fall of 2001, she saw Petitioner's truck, or one that looked like it, parked on a Manteca street near the home of the mother of Rico Clarke, an OSP member whose gang nickname was Sparkie or Sparky.

The jury heard a pretrial statement to Detective Zen by Victoria Lopez, who was married to but separated from another OSP member. In the pretrial statement, Lopez said Petitioner's truck had broken down, apparently while in the possession of Sparkie, who then got Petitioner a black Taurus to use. She said that Petitioner used the black Taurus for about three months right after the murder. At trial, Lopez tried to retreat from these statements by saying she was not sure that Petitioner had ever driven a white truck and then she said that she saw him driving a white pickup after the shooting. She largely denied any memory of her pretrial statements to Detective Zen.

Echeverria testified that she saw Petitioner driving his truck the day after the shooting but, in a pretrial statement to Detective Zen, she said that the truck was gone the day after the shooting and that she was told it was at the Stockton home of Sparkie and his wife Olga.  She acknowledged having told Detective Zen that Petitioner's clothing on the night of the shooting matched that of the shooter as described in news reports, that the police sketch looked "just like" Petitioner when he was trying to grow a goatee, and that whenever she asked Petitioner about the shooting, he got "weird" and said, "I don't know what you're talking about."

Detective Zen, the lead investigator on the case, testified that he first interviewed Echeverria after learning that she had called a police tip line about the killing.  When he showed her the artist's sketch of Trigueros's killer, she laughed or chuckled.  He testified that, when he asked her to explain, "She said, it looks like him [Petitioner] and that was when he was trying to grow a goatee.  She pointed to his chin area on the police sketch."  Detective Zen surreptitiously recorded a second interview with Echeverria, which was played for the jury.  In that interview, Echeverria referred to various circumstances tending to incriminate Petitioner, including that the truck was gone the day after the shooting.  Detective Zen testified that when he told Echeverria she would be subpoenaed for the preliminary hearing, she said that she would refuse to testify, or would testify falsely, out of fear of Petitioner and his friends.

In December 2002, Echeverria told Detective Zen that Petitioner's truck was at the Morgan Hill apartment of Petitioner's then current girlfriend, Priscilla Pena.  Detective Zen went there

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

and photographed the truck.  When he returned a few months later it
was gone and later tracked it to the home of Pena's sister
Elizabeth, where police seized it in March 2003.

The defense called witnesses who testified that Petitioner
had little, if any facial hair, had never attempted to grow a goatee
and, according to one witness, could not grow a moustache or, at
best, could grow only a small one.  However, a booking photo of
Petitioner taken in June 2001 depicts a somewhat sparse but distinct
moustache.  The defense noted that Echeverria testified that
Petitioner did not wear jewelry of any kind and that the police
sketch of the suspect depicts what looks like a bead necklace.
However, other photographs in evidence show that Petitioner had a
long tattoo above his collarbone that might be suggestive of a
necklace.  At the trial, Puphal testified that he told the sketch
artist that the feature "could have been something like a neckline."
At the preliminary hearing, however, Puphal had testified that it
"looked more like beads and not a tattoo."

In his closing argument, defense counsel emphasized that
no eye-witness had identified Petitioner as the shooter, Puphal's
description of the shooter did not look like Petitioner, and the
three witnesses who incriminated Petitioner--Sanchez, Lopez and
Echeverria--were all biased against him and, thus, were not
credible.

After deliberating for approximately three hours, the jury
returned a verdict of first degree murder.

**7**

United States District Court
For the Northern District of California

1

### III

2           Under the Antiterrorism and Effective Death Penalty Act of
3  1996 ("AEDPA"), codified under 28 U.S.C. § 2254, a federal court may
4  not grant a writ of habeas corpus on any claim adjudicated on the
5  merits in state court unless the adjudication:  "(1) resulted in a
6  decision that was contrary to, or involved an unreasonable
7  application of, clearly established Federal law, as determined by
8  the Supreme Court of the United States; or (2) resulted in a
9  decision that was based on an unreasonable determination of the
10  facts in light of the evidence presented in the State court
11  proceeding."  28 U.S.C. § 2254(d).

12           "Under the 'contrary to' clause, a federal habeas court
13  may grant the writ if the state court arrives at a conclusion
14  opposite to that reached by [the Supreme] Court on a question of law
15  or if the state court decides a case differently than [the] Court
16  has on a set of materially indistinguishable facts."  Williams
17  (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the
18  'unreasonable application' clause, a federal habeas court may grant
19  the writ if the state court identifies the correct governing legal
20  principle from [the] Court's decisions but unreasonably applies that
21  principle to the facts of the prisoner's case."  Id. at 413.

22           "[A] federal habeas court may not issue the writ simply
23  because that court concludes in its independent judgment that the
24  relevant state-court decision applied clearly established federal
25  law erroneously or incorrectly.  Rather, that application must be
26  objectively unreasonable."  Lockyer v. Andrade, 538 U.S. 63, 75-76
27  (2003) (internal quotation marks and citation omitted).  Moreover,
28  in conducting its analysis, the federal court must presume the

**8**

United States District Court
For the Northern District of California

1  correctness of the state court's factual findings, and the
2  petitioner bears the burden of rebutting that presumption by clear
3  and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court
4  explained: "[o]n federal habeas review, AEDPA 'imposes a highly
5  deferential standard for evaluating state-court rulings' and
6  'demands that state-court decisions be given the benefit of the
7  doubt.'"  <u>Felkner v. Jackson</u>, __ U.S. __, 131 S. Ct. 1305, 1307
8  (2011) (citation omitted).

9       Even if the state court's ruling is contrary to or an
10 unreasonable application of Supreme Court precedent, that error
11 justifies habeas relief only if the error resulted in "actual
12 prejudice."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  Thus,
13 habeas relief is granted only if the state court's error had a
14 "substantial and injurious effect or influence in determining the
15 jury's verdict."  <u>Id.</u>

16      When applying these standards, the federal court should
17 review the "last reasoned decision" by the state courts.  <u>Avila v.</u>
18 <u>Galaza</u>, 297 F.3d 911, 918 n.6 (9th Cir. 2002).  Because the
19 California Supreme Court summarily denied relief on Petitioner's
20 claims, this Court looks to the California court of appeal's January
21 9, 2009 written decision denying Petitioner's direct appeal.

22      With these principles in mind regarding the standard and
23 scope of review on federal habeas, the Court addresses Petitioner's
24 claims.

25                              IV

26                              A

27      Petitioner claims that the trial court's admission of
28 extensive hearsay evidence regarding his past crimes violated his

federal constitutional due process and confrontation rights.  The
appellate court stated: "Defendant acknowledges that this point was
not raised below, but asserts that this court should either grant
discretionary relief from the resulting forfeiture, or should find
that he was the victim of ineffective assistance of counsel."  The
court then addressed Petitioner's ineffective assistance of counsel
claim.  <u>People v. Zapata</u>, H030016 at 6.

     Unless a habeas petitioner shows cause and prejudice, a
federal court may not reach the merits of procedurally defaulted
claims in which the petitioner failed to follow applicable state
procedural rules in raising the claims.  <u>Sawyer v. Whitley</u>, 505 U.S.
333, 338 (1992) (citations omitted); <u>Farmer v. McDaniel</u>, 98 F.3d
1548, 1560 (9th Cir. 1996), <u>abrogated on other grounds by</u> <u>Slack v.
McDaniel</u>, 529 U.S. 473 (2000).  The Ninth Circuit has recognized and
applied the California contemporaneous objection rule in affirming
denial of a federal petition on grounds of procedural default where
there was a complete failure to object at trial.   <u>Inthavong v.
Lamarque</u>, 420 F.3d 1055, 1058 (9th Cir. 2005); <u>Paulino v. Castro</u>,
371 F.3d 1083, 1092-93 (9th Cir. 2004).  The cause standard requires
the petitioner to show that "'some objective factor external to the
defense impeded counsel's efforts'" to construct or raise the
claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 493  (1991).  A petitioner
may also show cause by establishing constitutionally ineffective
assistance of counsel, but attorney error short of constitutionally
ineffective assistance of counsel does not constitute cause and will
not excuse a procedural default.  <u>Id.</u> at 494.  Counsel's mere
failure to recognize the factual or legal basis for a claim, or
failure to raise the claim despite recognizing it, does not

constitute cause.  <u>Murray v. Carrier</u>, 477 U.S. 478, 486 (1986); <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 629 (9th Cir. 1997).

The only cause that Petitioner postulates for overcoming the forfeiture of these claims is ineffective assistance of counsel. As discussed below, counsel was not ineffective.  Therefore, habeas relief on the due process and confrontation claims based on admission of past crimes evidence is denied.

B

Petitioner asserts several grounds for his claim of ineffective assistance of counsel.

To establish ineffective assistance of counsel, a petitioner must show that (1) counsel made errors so serious that counsel was not functioning as the counsel guaranteed a defendant by the Sixth Amendment, and (2) the deficient performance prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Loveland v. Hatcher</u>, 231 F.3d 640, 644 (9th Cir. 2000) (citing <u>Strickland</u>, 466 U.S. at 687).

A difference of opinion as to trial tactics does not constitute denial of effective assistance, <u>United States v. Mayo</u>, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available.  <u>Bashor v. Risley</u>, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon

investigation; and (3) the decision appears reasonable under the circumstances.  Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  A label of "trial strategy" does not automatically immunize an attorney's performance from Sixth Amendment challenges.  United States v. Span, 75 F.3d 1383, 1389-90 (9th Cir. 1996).  For example, an attorney's misunderstanding of the law, resulting in the omission of his client's only defense, is not a strategic decision and amounts to ineffective assistance of counsel.  Id.

1

Petitioner argues that the prosecution's gang expert, Police Officer Geoff Guerin, should not have been permitted to testify about hearsay accounts of gang-related offenses in which Petitioner was involved, or that the jury should have been admonished not to accept such testimony for the truth of the matters asserted.  He claims that, because trial counsel did not object to this testimony or request a limiting instruction, he was denied effective assistance of counsel.

At trial, the prosecutor asked Officer Guerin to describe the conduct of the various gangs in the Gilroy area and then asked him to describe a number of gang-related crimes in which Petitioner had been held accountable.  Officer Guerin recounted the details of Petitioner's past crimes from police reports.  Officer Guerin testified that, in his expert opinion, Trigueros's shooting was a gang-related crime.

The California appellate court noted that, insofar as Officer Guerin's testimony might be considered for any purpose other than as the basis for his expert opinion concerning the applicability of the anti-gang statutes, it was objectionable.  The

appellate court also noted that the testimony was hearsay and lacked any foundation in the witness's firsthand knowledge.  The court agreed with Petitioner that, if counsel had objected, the testimony could have been excluded, or more likely would have admitted for a limited purpose, as could have been reflected in a limiting instruction.  <u>People v. Zapata</u>, H030016 at 6.

However, the appellate court held that this did not mean that counsel should have objected to Guerin's testimony or that his failure to do so constituted ineffective assistance.  The court explained that, to establish deficient performance on direct appeal, as opposed to habeas review where extrinsic evidence may be received, the record must affirmatively demonstrate that counsel lacked a rational tactical reason for the challenged conduct.  The court noted that an objection on the basis of hearsay or lack of foundation goes to the form of the evidence and that it was likely the evidence would be admissible if presented in a different manner. The evidence of Petitioner's participation in gang-related crimes was most likely admissible to show motive or intent.  Therefore, if the evidence could not be introduced through the testimony of Officer Guerin, it would most likely have been introduced through the testimony of an individual with personal knowledge of the subject.  <u>People v. Zapata</u>, H030016 at 7.

With this in mind, the court concluded that counsel could have withheld objection based on the reasonable strategy that a successful hearsay or foundational objection would have compelled the prosecution to introduce other, possibly more damaging evidence, such as testimony from one or more victims of Petitioner's past crimes.  <u>People v. Zapata</u>, H030016 at 7-8.

**United States District Court**
For the Northern District of California

1        Petitioner argued to the state court, as he does here,

2   that, if the prosecutor had stronger evidence, he would have

3   presented it.  The state court rejected this argument, explaining

4   that a prosecutor might have any number of reasons to prefer to

5   introduce evidence of this type in the form of a hearsay summary,

6   including the fact that it was more efficient to present the

7   information as a summary rather than with the testimony of

8   individual victims.  The court surmised that both the prosecution

9   and defense could have its own reasons for preferring hearsay--the

10  prosecution for conciseness and convenience and the defense for

11  reduced visceral impact.  <u>People v. Zapata</u>, H030016 at 8.

12       The court also surmised that a request to limit the

13  evidence to the jury's consideration of the soundness of the

14  expert's opinion would have meant that the jury would have heard

15  about Petitioner's other crimes twice: once as a basis for expert

16  opinion and once as substantive evidence of conduct to prove motive

17  and intent.  The court concluded that "[N]othing in this record

18  dispels the possibility that counsel reasonably believed it was

19  preferable to just have the jury hear it once, even if this meant

20  foregoing a meritorious hearsay objection."  <u>People v. Zapata</u>,

21  H030016 at 9.

22       As Respondent points out, the indictment charged, pursuant

23  to California Penal Code section 186.22(b)(1), that Petitioner had

24  committed the murder of Trigueros "for the benefit of, at the

25  direction of, or in association with a street gang."  1 CT 182-83.

26  Under California law, a street gang is an organization whose members

27  "individually or collectively engage in or have engaged in a pattern

28  of criminal gang activity."  Cal. Pen. Code § 186.22(f).  A "pattern

United States District Court
For the Northern District of California

of criminal gang activity" arises out of "the commission of, attempted commission of, conspiracy to commit, or solicitation of . . . two or more" specified crimes.  Cal. Pen. Code § 186.22(e).  The elements of a section 186.22 gang enhancement may be established through expert testimony regarding the culture, habits and psychology of gangs.  People v. Sengpadychith, 26 Cal. 4th 316, 322 (2001); People v. Gardeley, 14 Cal. 4th 605, 617 (1996).  Furthermore, as long as the material that forms the basis of expert opinion is reliable, even material that is ordinarily inadmissible, such as hearsay, can form the proper basis for an expert's opinion testimony.  Id. at 618.

In light of this authority, Officer Guerin's testimony, even if it was, in part, hearsay, was admissible as a basis for his opinion that the murder of Trigueros was to benefit or promote the OSP street gang.  Because Officer Guerin's testimony regarding Petitioner's prior crimes was not subject to a hearsay objection, defense counsel was not ineffective for failing to object on this basis.  Although defense counsel could have requested a limiting instruction, the fact that the same evidence would have been introduced a second time to prove motive and intent, made it reasonable for counsel to believe, as concluded by the state court of appeal, that it was preferable to have the jury hear it once and forego the instruction.  See Musladin v. Lamarque, 555 F.3d 830, 845-46 (9th Cir. 2009) (counsel's decision not to request limiting instruction on damaging evidence is within acceptable range of strategic tactics employed to avoid drawing attention to damaging testimony).

15

United States District Court
For the Northern District of California

Therefore, counsel's performance was not ineffective for failing to object to or request a limiting instruction regarding Officer Guerin's testimony about Petitioner's previous crimes.

Because counsel's performance was not deficient, there is no need to address the second <u>Strickland</u> prong regarding prejudice. However, as discussed below in the section on prejudice, even if counsel's performance was deficient, Petitioner has failed to establish that, but for counsel's unprofessional conduct, there is a reasonable probability that the result of the trial would have been different.

2

Petitioner claims that counsel was ineffective for failing to object to the lay opinions of Victoria Lopez and Nancy Echeverria who said that Petitioner was the person who shot and killed Trigueros.

The jury heard Detective Zen's pre-trial interview of Echeverria, in which she gave reasons for her belief "that I know he [Defendant] did it." At the trial, Echeverria testified that she did not remember what she had told Detective Zen when he interviewed her. The interview was used to refresh her recollection and was played to the jury. It was admitted into evidence, over defense attorney's objection. 2 RT 382. The relevant parts of the interview are:

> Zen: Okay, Now what, ah, after . . . he did the shooting . . . He never said anything to you. So, directly, you can't say that he said, I shot
>
> . . .
>
> Echeverria: Right, Right.

Zen: But if you said because OSP just, just is common knowledge or, or what?

Echeverria: Ahh, that I know that he did it?

Zen: Yeah.

Echeverria: Basically, yeah.  I mean, common sense tells you there's . . . it was basically all common sense.  I always keep abilities.  I know him inside out.  I know when he does, and I know when he doesn't do.  And I knew, I knew.

. . .

Echeverria: [H]e never told me that.  He never said, well, when I bring it up, he gets weird, and he just wouldn't even want to talk about it. It's just like, he'd go, I don't know what you're talking about . . .

. . .

Zen: You know, how, there's no point . .. . for you to realize or assume or something.

Echeverria: Well, the, for the fact of the main thing is, is that, he was gone during that time. He was wearing that outfit.  The sketch looked just like him.  The truck was gone the next day, in the morning.

Zen: Okay.

Echeverria: And so everything kind of made sense.  And I even told the family, I'm like, he did it.  I'm like, you want us to think that he's gonna lend the truck out to some guy.  And he's gonna be car-less for like, a year and a half?  Come on.

People v. Zapata H030016 at 10 n.3.

        The jury also heard Lopez's pretrial statement to Detective Zen.  In answer to Detective Zen's question, "what can you tell me about [Trigueros's murder]?" Lopez answered, "Honestly, I'll tell you, I kind of think that it was stupid Paul."  People v. Zapata H030016 at 10 n.4.

United States District Court
For the Northern District of California

The California appellate court noted that the statements were objectionable under either California's rule of evidence governing lay opinion or under the general prohibition against opinion testimony concerning a defendant's guilt of the charged offense.  The court concluded, however, that because the record did not establish that counsel lacked a tactical reason for allowing these opinions into evidence, his failure to object did not constitute ineffective assistance.

The record shows that counsel objected to Lopez's response to the prosecutor's question whether she had told Detective Zen that she "thought Paul Zapata was the shooter because that's the only -- one that you had ever seen driving a truck like that?"  2 RT 311.  Lopez responded, "I don't remember telling him that.  I don't remember."  2 RT 312.  Counsel objected to her opinion as speculative and asked that the answer be stricken.  2 RT 312.  The court responded that "the question and answer will stand limited only as to what her state of mind is."  2 RT 312.  Thus, counsel may not have objected to her opinion in her pre-trial statement to Detective Zen because it would have been futile to do so.

Furthermore, as the appellate court noted, the record reflects that Echeverria's and Lopez's accusations of Petitioner played a central role in the defense strategy.  During cross-examination, Echeverria admitted that she was angry at Petitioner because he cheated on her with other women. 2 RT 404.  During cross-examination, Lopez admitted that, when she was brought to the police station to be questioned by Detective Zen, she had been afraid that her children would be taken away from her.  2 RT 323.  In his closing argument, counsel grouped Echeverria and Lopez with Sarah

United States District Court
For the Northern District of California

Sanchez, who had incriminated Petitioner by testifying that he admitted to her that he had shot someone at the 7-Eleven.[1]  Counsel pointed out that Sanchez was angry with Petitioner because, after she ended her relationship with an OSP member, other OSP members, including Petitioner, had assaulted her new boyfriend who was not an OSP member.  4 RT 907-08.  Counsel labeled Echeverria, Lopez and Sanchez, "informants," who had come forward with a story incriminating Petitioner for their own purposes.  4 RT 854, 901, 907-08, 911, 919-20, 927.  Counsel charged investigators and the prosecution with stubborn credulousness by believing the obviously false stories of these three women and, in doing so, he himself cited the three incriminating "opinions."  Given this strategy, counsel reasonably could conclude that it would have been futile to object to these witnesses' opinions while allowing in the factual assertions.  In fact, their opinions are what counsel emphasized in his closing as demonstrating their prejudice and intent to frame Petitioner.

Thus, because counsel had a reasonable strategy for not objecting to the opinions in the pre-trial statements of Echeverria and Lopez, his performance was not deficient.

3

Petitioner asserts that counsel was ineffective for failing to object to Officer Zamora's testimony that the sketch he drew of the killer under the direction of eyewitness Puphal

---

[1] Petitioner does not include Sanchez's incriminating testimony in his claim but, as pointed out by the appellate court, counsel's treatment of Sanchez's testimony is germane to the existence of his tactical motive for acquiescing in the introduction of similar incriminating statements by Echeverria and Lopez.

resembled a June 2001 photograph of Petitioner because the testimony did not meet the requirements for admissibility as lay opinion and did not help the jury to understand any properly admitted testimony.

Because Petitioner was thinner at the time of the trial in 2004 than he was at the time of shooting in 2001, see 7 RT 385-86 (Echeverria stated that Petitioner looked thinner in the courtroom than he did in 2001), the prosecutor showed Zamora Exhibit 31, a photograph of Petitioner taken in June 2001, and asked him to compare it to his 2001 sketch based on Puphal's description of the shooter.

The testimony at issue is as follows:

Q: [C]ompared to your original sketch, do you see features that are similar between the person depicted in 31 and your original sketch?

A: Well, I'm just looking at it in a likeness scale for me, and my thing is when I look at my sketch compared to this photograph of whoever this is I would say that there's definitely some likeness. . . . Obviously, there's some discrepancies with the goatee. There seems to be some more hair here, here than there, but here are definitely some likenesses.

Q: The nose is right on?

A: I would say it's comparable.

Q: The lips?

A: Comparable.

Q: Mustache?

A: Yes.

Q: Eyebrows?

A: Yes.

Q: Shape of the face generally?

20

1          A: Yeah, to me I think my guy is stocky, and the
            fellow here seems to be a little wide and
2           stocky.

3     2 RT 480-81.

4          Defense asserted, in an unrecorded sidebar conference, an

5     advance objection to improper opinion testimony comparing the photo

6     and the sketch but, after the witness testified, counsel said that

7     it had been his concern that "Mr. Zamora was going to be asked what

8     I felt would be an improper opinion.  That's not what transpired.

9     And my concerns were allayed."  2 RT 488.

10         The state appellate court concluded that this evidence

11    should not have been admitted because, as was evident from Officer

12    Zamora's testimony, he had no independent recollection of anything

13    about the case.  The appellate court noted that, because the

14    prosecutor did not qualify Zamora as an expert on physiognomic

15    resemblance or any other subject, his testimony was only admissible

16    if it met the requirements for lay opinion under California Evidence

17    Code section 800, which it did not because it did not help the jury

18    understand any of his properly admitted testimony.

19          However, the appellate court concluded that counsel's

20    failure to object did not constitute deficient performance because

21    he could have rationally thought that "the degree of resemblance

22    between the two depictions was a matter as to which anyone's opinion

23    was as good as anyone else's" and that "the jury might find less

24    resemblance than he claimed, and thus find the prosecution's overall

25    case that much less credible."  <u>People v. Zamora</u>, H030016 at 16.

26    The appellate court also concluded that the admission of the

27    evidence would not have influenced the verdict because Officer

28    Zamora did not say that the sketch depicted the same person as the

photo, he merely said that there was "some likeness" and that
certain features were "comparable."  The court continued, "Having
examined both exhibits, we do not believe there is any real
possibility that the jury would have failed to reach this same
conclusion on its own.  There are arguable resemblances, as well as
differences, between them.  The critical question was whether the
resemblance was great enough to warrant an inference that defendant
was the person seen by the eyewitness Puphal and described by him to
Officer Zamora.  The latter was not asked, and did not attempt to
answer, that question."  <u>People v. Zapata</u>, H030016 at 16.

Petitioner argues that the appellate court's opinion was
unreasonable because Officer Zamora's testimony regarding the
similarities between his sketch and the 2001 photograph of
Petitioner lent his expertise to the most important question before
the jury, whether Puphal was describing Petitioner or an
unidentified person to Officer Zamora as the shooter.  Petitioner
argues that it was extremely important to the prosecutor's case to
have Officer Zamora testify that the sketch resembled Petitioner
because Puphal had failed to identify Petitioner as the shooter in a
lineup and, thus, there was no evidence placing Petitioner at the 7-
Eleven at the time of the shooting.

As noted by Respondent, Petitioner was in the courtroom
during the entire trial and, thus, the jurors could compare him to
Zamora's sketch on their own.  The jurors also had both Officer
Zamora's sketch and the 2001 photograph to compare and could draw
their own conclusions regarding the similarities between the two.
In light of the deference that must be given to state court opinions
under AEDPA, this Court cannot say that the appellate court's

analysis on both deficient performance and prejudice was
unreasonable.

### 4

Petitioner argues that counsel was ineffective for failing
to object to hearsay testimony regarding the location of his Toyota
pickup truck.  The evidence regarding the Toyota pickup was
important because a substantial part of the prosecution's case was
based on the premise that Petitioner's white Toyota pickup truck,
which matched the description of the truck driving the gunman away
from the scene of the crime, disappeared from Gilroy immediately
after the shooting.

### a

Petitioner contends that his counsel should have objected
to Echeverria's testimony that he sent his truck to Sparkie in
Stockton, where it remained until 2002, when his family had it towed
back to Hollister.  Petitioner claims this testimony was hearsay and
without a proper foundation.

In her pretrial statement to Detective Zen, Echeverria
stated that she knew Petitioner was the shooter and that one of the
circumstances that led her to believe this was that his "truck was
gone the next day, the next morning," and that it was unlikely that
Petitioner had lent the truck out to some other person.  When
Detective Zen reviewed the circumstances with her, Echeverria again
stated, "That truck was gone the very next morning or next day."
Asked how she knew this, Echeverria stated, "He didn't drive it no
more," and "Everybody knew that it was gone like, the next day."

As the state appellate court pointed out, Echeverria's
recorded statements did not become admissible until she contradicted

United States District Court

For the Northern District of California

them in her trial testimony, which she did in many instances.  For instance, at the trial, she testified that she saw Petitioner driving the truck a few hours after the shooting and that, in late spring or early summer of 2001, Petitioner had driven her to San Jose in the truck.  She also testified that she saw the truck in August, 2002 in Hollister, where people were trying to repair it. She testified that she originally lied to Detective Zen because she wanted to "burn" Petitioner.  Therefore, many of Echeverria's pretrial statements were admissible to impeach her and were not subject to a hearsay objection.

The appellate court also pointed out that Echeverria's statements about the truck disappearing was information that she personally observed as Petitioner's girlfriend and, thus, they were not hearsay and were within her personal knowledge and, in this regard also, an objection to them would not have been sustained. The appellate court noted, however, that Echeverria's statement to Detective Zen that she learned of the whereabouts of Petitioner's truck from Sparkie's wife or the mother of Sparkie's girlfriend, who said, "yeah, we have [the truck].  We're driving it around," was objectionable as hearsay.  The court theorized that defense counsel may not have objected to it, not because it helped the defense, but because Echeverria's trial testimony on the same subject might do so.  At trial, Echeverria testified that Sparkie's mother or grandmother told her that Petitioner's truck was "over there" but that it was "broken down."  In his cross-examination of Echeverria, counsel sought to elaborate on this point, eliciting testimony that the truck had broken down two or three times and Petitioner could not afford to get it fixed.  Thus, counsel might have allowed the

United States District Court
For the Northern District of California

prosecution to produce hearsay testimony about the truck because it opened the door to Echeverria's hearsay testimony regarding its disrepair, which provided the defense with an explanation to compete with the inference of deliberate concealment put forth by the prosecution.

The appellate court also found it "impossible to say" that the admission of the challenged evidence was prejudicial to Petitioner.  This conclusion was based on the fact that Echeverria's statements that the truck had disappeared immediately after the shooting was admissible and that the additional hearsay statements about the truck being in Hollister or Stockton would likely not have changed the jury's view of whether or not Petitioner hid his truck after the shooting.

The appellate court's analysis regarding deficient performance and prejudice is not unreasonable.

b

In a pretrial statement to Detective Zen that was placed before the jury, Lopez said that Petitioner's truck had "broken down," while in the possession of Sparkie, who then got Petitioner a black Taurus.  Detective Zen asked Lopez, "Was it broken down or did they just stash it out?"  Lopez replied, "The story they gave me is that it broke down when they were, when Paul was working with, with Sparkie."  She said that Petitioner had used a black Taurus for about three months after the murder.  Detective Zen asked if "they just swapped," to which Lopez replied, "That, see that's why I was like, I told Edward, 'What happened to the truck?' and he's like, he said that it was broke, that, it's at Sparkie's. . . . And then I had told [defendant], 'What happened to the truck?'  And he said

1   that, he goes, 'Oh, well, it broke down when I was working with

2   Sparkie.'  He goes, 'He let me come over in this car.'"

3          At trial, Lopez tried to retreat from these statements.

4   She testified that she was not sure that Petitioner ever had a white

5   truck; then she testified that the truck that was shown to her in a

6   photographic exhibit looked too small to be Petitioner's truck.  She

7   also testified that she saw Petitioner driving a white pickup after

8   the shooting and then, several weeks later, he got a black car.  She

9   denied any memory of her pretrial statements to Detective Zen.

10         Petitioner claims that Lopez's recorded pretrial

11  statements to Detective Zen were objectionable hearsay based on her

12  statement that 'they' told her that the truck had broken down when

13  Petitioner was working with Sparkie and that Sparkie had the truck

14  and had given Petitioner a black Taurus to use.  Petitioner notes

15  that Lopez said that she learned of some of this information from

16  her husband Edward.

17         The appellate court rejected Petitioner's claim, reasoning

18  as follows:

19              [S]ome of this testimony may have been subject
                to exclusion as hearsay or for lack of
20              foundation, but again it is impossible to say
                that counsel had no tactical motive for failing
21              to require that the objectionable matter be
                excised and excluded.  Lopez's pretrial
22              statement has defendant himself telling her that
                the truck was in the possession of Rico "Sparky"
23              Clarke.  At trial Lopez flatly denied that
                defendant had told her such a thing.  This made
24              her pretrial statement admissible as a prior
                inconsistent statement.  (Evid. Code, section
25              1235.)  Defendant's own statements are of course
                admissible, at the prosecution's instance, as
26              statements by a party opponent.  (Evid. Code
                section 1220.)  Given that this evidence was
27              admissible over a hearsay objection, it is
                impossible to say that counsel had no tactical
28              reason for failing to object to other evidence

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> to similar effect, or that the admission of such
> evidence was prejudicial to the defense.

People v. Zapata, H030016 at 23.

As pointed out by the state court, some of the evidence about Petitioner's truck was not subject to a hearsay objection and the jury would hear from Lopez and from Echeverria that his truck was at Sparkie's house after the shooting.  Therefore, it was reasonable for counsel not to object to any hearsay testimony on the same subject.

Accordingly, the appellate court's analysis was not an unreasonable finding of facts in light of the evidence.

c

Petitioner objects to Detective Zen's testimony about his investigation of a telephone conversation regarding a white truck. This claim involves the testimony of Anthony Villalobos, a prosecution witness who authenticated a January 2003 telephone conversation in which he was speaking to Eric Garcia, an OSP member. The conversation was recorded because it originated from the Santa Clara County jail.  In the conversation, Villalobos referred to a scene in the television program, "Fugitive Watch," involving a white truck.  Garcia seemed not to comprehend, and Villalobos said, "[R]emember that, remember that white truck a long time ago," and then explained, "[I]t's fucking still there.  Chivo came over ear [sic] . . . about like 15 minutes ago, 20 minutes ago, told him we needed to find [a way] to get it out of here right now."  Later he said, "I already talked to that ugly mother fucker, that scary guy. . . . And he said . . . get rid of it anyway, it don't matter.  So

27

. . . I called Chivo and Chivo said we can take it to his people's house out in the country and fucking part [sic] it out or whatever." People v. Zapata, H030016 at 23-24.

At trial, Villalobos testified that the white truck was Petitioner's, for which the police had been searching.  But, he also testified that he had only seen the white truck in a magazine article or television program produced by Fugitive Watch, a local crime-prevention organization.  Villalobos also testified that he did not know to whom the "scary guy" referred, although later, he conceded that it could possibly be Petitioner, whose gang nickname was "Spooky."  However, he insisted that he was not referring to Petitioner's truck, but only something similar that he had seen on Fugitive Watch.  The prosecutor asked, "What if I was [sic] to tell you that it never ran on Fugitive Watch?"  Villalobos replied, "I'd have to say you're lying," and insisted, "I seen it on Fugitive Watch."

It was in this context that Detective Zen testified that he had investigated whether the May 19, 2001 murder ever ran on the show the "Fugitive Watch."  Detective Zen stated:

> I talked to Jay Shields of the San Jose Police Department, the person that is co-owner of the Fugitive Watch.  Let me back up.  I first asked another detective with the Gilroy Police Department to check on it for me.  He checked the dates of 2000/2001 and found that there was no airing of Fugitive Watch having to do with this case.  I then realized that he only checked 2001.  I called Mr. Shields back and told him or asked him, which he agreed and checked from the year 2000 until present and he said that it was not aired. . . .

2 RT 701.

1      The appellate court concluded that the challenged

2 testimony might have been successfully objected to as hearsay.

3 However, the court reasoned that counsel could have had a tactical

4 reason for declining to object.  The court posited that, if

5 Detective Zen's testimony was challenged, the source of the evidence

6 in question, the program's co-owner, could readily be summoned as a

7 witness, and he might give testimony more damaging than Detective

8 Zen's hearsay testimony.  The court stated:

9          [O]ne potential for increased damage is
           reflected in the failure of Detective Zen's
10         testimony to squarely meet the most exculpatory
           interpretation that might be placed on
11         Villalobos's testimony.  Villalobos did not
           assert–at least not clearly–that he saw an
12         episode of Fugitive Watch concerning the 7-
           Eleven shooting.  He claimed, or at least could
13         be understood to claim, to have seen a white
           pickup being sought in connection with some
14         unspecified murder, and to have been concerned
           that the mere resemblance between that pickup
15         and defendant's, which he had been told was
           sought by police, might bring unwanted police
16         attention to Villalobos's own activities, which
           he conceded tended toward the unlawful.  Had a
17         witness with personal knowledge of the program's
           content been called, he might have testified
18         that there was never any episode involving a
           pickup resembling defendant's.  Defense counsel
19         might thus have very well concluded that there
           was little promise and much risk in objecting to
20         Zen's hearsay testimony.

21 People v. Zapata, H030016 at 25.

22      Petitioner argues that the testimony of the program co-

23 owner would not have been more detrimental to his defense than

24 Detective Zen's testimony.

25      However, as explained by the state appellate court, a

26 witness with knowledge of all the Fugitive Watch programs could have

27 testified that an episode with a white pickup never aired, and this

28 would have been more detrimental to Villalobos's credibility than

29

Detective Zen's hearsay testimony.  Because counsel could have had this strategic reason for not objecting to Detective Zen's testimony, the state court's denial of this claim was not contrary or an unreasonable application of <u>Strickland</u> or an unreasonable determination of the facts.

C

Petitioner asserts several grounds for relief based on prosecutorial misconduct.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986).  Under <u>Darden</u>, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005).  Even if the prosecutor's actions constituted misconduct, when a curative instruction is issued, the court presumes that the jury has disregarded inadmissible evidence inadvertently presented to it and that no due process violation occurred.  <u>Greer v. Miller</u>, 483 U.S. 756, 766 n.8 (1987); <u>Darden</u>, 477 U.S. at 181-82 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair because curative instructions were given by the trial judge).

Other factors which the court may take into account in determining whether prosecutorial misconduct rises to the level of a due process violation are (1) the weight of the evidence of guilt,

30

United States District Court
For the Northern District of California

see <u>United States v. Young</u>, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, <u>see</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, <u>see</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); and (4) whether the prosecutor's comment misstated or manipulated the evidence, <u>see</u> <u>Darden</u>, 477 U.S. at 182.

In closing arguments, the prosecution must be allowed "to strike hard blows based on the evidence presented and all reasonable inferences therefrom." <u>Ceja v. Stewart</u>, 97 F.3d 1246, 1253-54 (9th Cir. 1996). "A court should not lightly infer that a prosecutor intend[ed] an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 647 (1974).

Under California law, claims of prosecutorial misconduct must be objected to at trial in order to be preserved upon appeal. <u>People v. Fosselman</u>, 33 Cal. 3d 572, 580-81 (1983). A petitioner who fails to observe a state's "contemporaneous objection" rule may not challenge the constitutionality of the conviction in federal court. <u>Engle v. Isaac</u>, 456 U.S. 107, 129 (1982). A petitioner is not barred and therefore does not have to show cause and prejudice, however, when a reviewing state court overlooks the procedural default and considers the claim on the merits. <u>Thomas v. Hubbard</u>, 273 F.3d 1164, 1176 (9th Cir. 2002), <u>overruled on other grounds by Payton v. Woodford</u>, 299 F.3d 815 (9th Cir. 2002) (en banc).

1

**United States District Court**
For the Northern District of California

Petitioner argues that the prosecutor committed misconduct in his closing argument by alluding to the absence of defense evidence or explanation about the whereabouts of Petitioner's truck and Petitioner's whereabouts at the time of Trigueros's murder. Specifically, the prosecutor noted that, although there was "talk about" how Petitioner's truck "breaks down all of the time," there was "no evidence that it broke down" because no witness came and said, "oh, yeah, I was with Paul and it broke down, you know, and we took it out to the Ramirez brother[s'] ranch." <u>People v. Zapata</u>, H030016 at 27. Regarding Petitioner's lack of an alibi, the prosecutor told the jury:

> Let's be real clear on that. We don't know where [Petitioner] was at the time of the shooting.
>
> The [defense] didn't bring in [a] witness to tell us that he was sitting with me at 2:03 in the morning, do we? And the defense didn't put on a witness, an alibi witness, to say, hey, he was with me in San Jose, he was with me in Hollister. We don't know where he was. Oh, yeah, we do. He was at the 7-Eleven on Leavesley killing Juan Trigueros.

4 RT 976.

Citing <u>Griffin v. California</u>, 380 U.S. 609 (1965) and California cases, Petitioner contends these remarks violated the rule that a prosecutor must not comment upon a defendant's failure to testify, which would be a violation of his Fifth Amendment right to remain silent. Petitioner contends that, although the prosecutor did not specifically comment on his failure to testify, the prosecutor implicitly drew the jurors' attention to that failure because he was likely the only person who would have personal knowledge of his whereabouts on the night of the murder.

United States District Court
For the Northern District of California

1    In <u>Griffin</u>, 380 U.S. at 611-15, the Court ruled that

2  prosecutors may not comment on the defendant's failure to testify

3  because it might penalize the defendant for exercising his right to

4  remain silent.   Although a direct comment about the defendant's

5  failure to testify violates <u>Griffin</u>, a prosecutor's indirect comment

6  violates <u>Griffin</u> only "if it is manifestly intended to call

7  attention to the defendant's failure to testify, or is of such a

8  character that the jury would naturally and necessarily take it to

9  be a comment on the failure to testify."   <u>Hovey v. Ayers</u>, 458 F.3d

10  892, 912 (9th Cir. 2006); <u>also</u> <u>see</u>, <u>United States v. Castillo</u>, 866

11  F.2d 1071, 1083 (9th Cir. 1988) (prosecutor may properly comment

12  upon defendant's failure to present witnesses so long as it is not

13  phrased to call attention to defendant's own failure to testify).

14  Even if the prosecutor's statements violate <u>Griffen</u>, "reversal is

15  warranted only where such comment is extensive, where an inference

16  of guilt from silence is stressed to the jury as a basis for the

17  conviction, and where there is evidence that could have supported

18  acquittal."   <u>Hovey</u>, 458 F.3d at 912.

19    The California court of appeal looked at each of the cases

20  Petitioner cited and concluded that he overstated the breadth of

21  their holdings.   The appellate court stated:

22    We do not believe the prosecutor here ran afoul
       of <u>Griffin</u> as applied in these cases.   The
23    challenged comments drew attention to the lack
       of defense evidence that defendant's pickup was
24    actually broken down after the shooting, and to
       the absence of any evidence of defendant's
25    whereabouts when the shooting took place.   The
       first point scarcely even hints at <u>Griffin</u> error
26    since if defendant's truck was in fact broken
       down, there might be any number of witnesses who
27    could so testify.   The second point has more
       substance because a defendant may indeed be the
28    sole witness to his whereabouts *if he is alone*.

33

United States District Court
For the Northern District of California

> But there was no reason to suppose that
> defendant was alone.  He had left the party with
> another OSP member, whom he was supposedly
> giving a ride to work.  But, assuming he dropped
> that member off before the shooting, there was
> no reason to suppose that he spent the rest of
> the evening in solitude.  There was simply no
> reason to assume that defendant was the only
> witness to his whereabouts at that time.
> Drawing attention to the absence of alibi
> evidence was therefore not an impermissible
> comment upon defendant's own failure to testify.

People v. Zapata, H030016 at 29 (emphasis in original).

As found by the court of appeal, the prosecutor's remarks about the lack of defense evidence regarding the whereabouts of Petitioner's pickup truck does not implicate Griffin because other witnesses could have testified to this and, thus, Petitioner's lack of testimony was not implied.  Similarly, the prosecutor's remarks about Petitioner's whereabouts at the time of the murder were directed at his lack of one or more alibi witnesses, not at the fact that Petitioner did not testify.  As stated by the court of appeal, because another witness could have been with Petitioner at that time, Petitioner's testimony was not needed to establish his whereabouts.  Furthermore, the trial court gave the standard jury instructions on the presumption of innocence and the defendant's privilege against self-incrimination.  And, as discussed below regarding prejudice, the evidence against Petitioner was strong and, thus, these remarks did not have a substantial or injurious effect on the outcome of the trial.

Accordingly, the state appellate court's denial of this claim was not unreasonable.

2

**United States District Court**
For the Northern District of California

1    Petitioner argues that the prosecutor committed misconduct

2  by arguing that Petitioner's gang membership and prior attacks on

3  Sureños made him predisposed to carry out Trigueros's murder.   The

4  allegedly improper statements are as follows:

5              The law does not undertake to measure in units
             of time the length of the period during which
6            the thought must be pondered before it can ripen
             into an intent to kill which is truly deliberate
7            and premeditated.   Time will vary with different
             individuals and varying circumstances.   And that
8            basically means that a person who has spent his
             whole life basically doing one thing and that's
9            what the evidence [is] in this case.   The
             defendant's whole life is about OSP.   There's no
10           evidence that he's captain of the softball team
             or is a high school football pitcher--or
11           baseball pitcher.   His life is about OSP and you
             heard all about that.   And you can consider that
12           in deciding whether or not this is first degree.
             [Petitioner] has been premeditating the murder
13           of Eighth Street Sureños for years.   You heard
             all that evidence, and I'll talk about that in a
14           minute.   If you're an innocent person or just a
             regular person, not a gang member or violent
15           gang member, it may take you longer to
             premeditate, and that's what this is talking
16           about.   The true test is not the duration of
             time but rather the extent of the reflection of
17           cold, calculated judgment and decision may be
             arrived at in a short period of time, but a mere
18           unconsidered and simple impulse, even though it
             includes the intent to kill, is not pre--or
19           deliberated or premeditation as will fix an
             unlawful killing as murder in the first degree.
20           And, again, this gives you something to go by
             again.   And we all know it's [Petitioner] has
21           premeditated murder, has premeditated on Eighth
             Street members, premeditated attacks on Mexican
22           nationals for years.   He's predisposed to that,
             and you can take that into consideration.

23 4 RT 798-99.

24    Petitioner also objects to the following statement in the

25 prosecutor's rebuttal closing argument:

26           We all know about the attacks and crimes against
             Eighth Streeters and Mexican nationals.   His
27           motive is so great to attack these types of
             people he's willing to beat up a 53 year old
28

35

1

> Mexican national.  He's willing to discharge a
> gun at an Eighth Street Sureño in '97.  He's
> willing to boot kick a Mexican national in '98
> in the head.  That's his intent when it comes to
> dealing with people like Juan Trigueros and
> that's his motive and that's something you can
> use to decide whether he's got the intent and
> motive to do these things and he does.

4 RT 991-92.

The state appellate court acknowledged that the prosecutor, by saying that Petitioner was "predisposed" to committing crimes against Mexican nationals, came close to violating the rule against using character evidence to show that the defendant was predisposed to committing the charged crime.  However, the appellate court denied the claim, based on the following reasoning:

> We are uncertain that this statement, closely
> parsed, was an inaccurate characterization of
> the law.  The vice at which the rule against
> character evidence chiefly aims is a direct
> inference of guilt based upon a defendant's
> apparent predisposition to commit crimes of the
> type charged.  With one exception, the arguments
> challenged here all *assumed* that defendant
> killed Juan Trigueros; his predisposition to
> inflict violence of [sic] persons like Trigueros
> was argued as a basis not to identify defendant
> as the killer but to infer a particular element
> of the offense, i.e. intent or premeditation.
> The one exception was motive, the apparent
> argument here being that defendant's manifest
> hatred of persons like Trigueros constituted a
> motive to kill him, which in turn supported
> several incriminating inferences, including that
> it was indeed defendant who committed this
> seemingly pointless killing.  Any inaccuracy in
> the argument appears too slight to prejudice
> defendant, particularly since the jury was
> plainly instructed *not* to draw an inference of
> guilt from predisposition.

People v. Zapata, H030016 at 30-31 (emphasis in original).

Citing McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993) and other pre-AEDPA cases, Petitioner argues that the appellate court's decision was unreasonable because it ignored the general rule that

United States District Court
For the Northern District of California

36

evidence of a person's character may not be offered to prove his conduct on a specific occasion.

The use of character evidence to show propensity to commit a specific crime is not allowed because it would allow the jury to base its verdict on emotion and not the evidence. Id. at 1384. However, the admission of other crimes evidence violates due process only where there are no permissible inferences the jury can draw from the evidence. Id. It is generally upheld where: (1) there is sufficient proof that the defendant committed the prior act; (2) the prior act is not too remote in time; (3) the prior act is similar (if admitted to show intent); (4) the prior act is used to prove a material element; and (5) the probative value of admitting evidence of the prior act is not substantially outweighed by any prejudice the defendant may suffer as a result of its admission. McDowell v. Calderon, 107 F.3d 1351, 1366 (9th Cir. 1997), vacated in part by 130 F.3d 833, 835 (9th Cir. 1997) (en banc).

In post-AEDPA habeas cases, the Ninth Circuit has held that, based on the Supreme Court's reservation of this issue in Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) as an "open question," a petitioner's due process right concerning the admission of prior crimes to show propensity for criminal activity is not clearly established under 28 U.S.C. § 2254(d) and therefore cannot form the basis for federal habeas relief. Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008).

Therefore, Petitioner's claim that the propensity evidence was admitted improperly is not cognizable on habeas review. Even if it were, the claim would be denied on the ground that the evidence was admissible to establish intent, a material element of the

prosecutor's case regarding premeditation.  Furthermore, there was
sufficient proof that Petitioner committed the prior acts, they were
not remote in time from the charged crime and they were similar to
the charged crime in that they all involved attacks on Mexican
nationals.  Therefore, it was reasonable for the appellate court to
conclude that it was proper for the prosecution to argue that the
prior bad acts evidence showed that Petitioner had the intent to
kill Trigueros, a young Hispanic male who wore the number 8 in
Norteño territory.  The fact that the prosecutor once used the word,
"predisposed," in the middle of this argument does not demonstrate
prosecutorial misconduct.

       Accordingly, the appellate court's denial of this claim
was neither contrary to nor an unreasonable application of Supreme
Court authority.

                              3

       Petitioner argues that the prosecutor improperly mentioned
in his closing argument that Sanchez had asserted her Fifth
Amendment privilege against incriminating herself during her
testimony because it invited an improper inference that her
testimony for the prosecution was credible.  Petitioner argues that
this is misconduct because a prosecutor may not express a personal
opinion about or vouch for the credibility of any witness's
testimony.

       On direct examination, the prosecutor asked Sanchez
whether she had "ever helped OSP" during the gang's early years.  2
RT 442.  Sanchez replied, "I don't know.  I'm--that I'm not going to
answer.  I won't answer that because I'm not going to incriminate
myself."  2 RT 442.  In his closing argument, the prosecutor

referred to this exchange when discussing Petitioner's reason for asking Sanchez to drive his truck to the home of Sparkie in Stockton:

> [W]ho can you trust?  Do you want [an] OSP male gang member to drive that car to Rico's house? No.  Why?  Because they're looking for a white pickup truck.  Once an OSP gang member gets pulled over in a white pickup truck you're in trouble.  Who is the best person to ask to drive that?  Sarah [Sanchez].  Because [Sanchez] has a history of helping OSP.  Do you remember that? In '97 she's helping hide those guys.  The testimony came out when I asked her have you done favors for OSP.  She said I don't want to incriminate myself.  Okay.  She's a player at that point.  She's somebody they can trust. She's friends with [Petitioner].  She's the perfect person to drive that car to Rico's house.

4 RT 822.

The state appellate court agreed that the prosecutor committed misconduct by inviting an improper inference from Sanchez's invocation of the Fifth Amendment.  The court also found it improper because it invited the jury to treat unanswered questions as substantive evidence.  However, the court found that Petitioner suffered no prejudice from the prosecutor's improper argument because there was no reasonable possibility that it effected the outcome of the trial.  The court's conclusion was based on the fact that Sanchez's invocation of the Fifth Amendment was surrounded by her testimony that she hung around with the OSP, was friendly to is members, sometimes did them favors and she affirmed that she was somebody they could rely on.  The court concluded that:

> The whole subject of her relationship to the gang was peripheral to the case.  That her involvement rose to levels of criminal culpability, even if shown, would add nothing of measurable substance to the case against defendant.  Thus, her constitutionally protected

United States District Court
For the Northern District of California

1

        unwillingness to testify about any "help" she
2       rendered to the gang, even if improperly viewed
        by the jury as evidence that she rendered help
3       of a criminal nature, can have no conceivable
        effect on the jury's assessment of defendant's
4       guilt.

5  <u>People v Zapata</u>, H030016 at 31-32.

6       A prosecutor may not vouch for the credibility of a

7  witness.  <u>United States v. Moreland</u>, 622 F.3d 1147, 1161 (9th Cir.

8  2010); <u>United States v. Lopez</u>, 803 F.2d 969, 973 (9th Cir. 1986)

9  (improper to suggest that witness found credible by the grand jury

10 should therefore be credible to the trial jury).  Improper vouching

11 for the credibility of a witness occurs when the prosecutor places

12 the prestige of the government behind the witness or suggests that

13 information not presented to the jury supports the witness's

14 testimony.  <u>United States v. Young</u>, 470 U.S. 1, 7 n.3, 11-12 (1985).

15      Petitioner's argument that the prosecutor's reference to

16 Sanchez's invocation of her privilege against self-incrimination

17 constituted vouching is unpersuasive.  As indicated by the appellate

18 court, the prosecutor was using Sanchez's invocation of the

19 privilege as evidence that she was involved in criminal gang

20 activity and, thus, would have been seen by Petitioner as a

21 trustworthy person to ask to hide his pickup truck.  As reasonably

22 concluded by the appellate court, this did not add anything to what

23 the jury already knew--that, at some time in the past, Sanchez was

24 involved with, and did favors for, members of the OSP gang.

25 Therefore, the state appellate court reasonably concluded that, even

26 though the prosecutor's statement was improper, it did not prejudice

27 Petitioner.

                                    4
28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Petitioner argues that the prosecutor committed misconduct

2  by implying that the defense had the burden of producing evidence

3  establishing a reasonable doubt of Petitioner's guilt.

4    In discussing reasonable doubt in his closing argument,

5  the prosecutor first read to the jury the standard reasonable doubt

6  instruction, and then stated:

> What it breaks down to is that you can speculate
> about a lot of things, you can guess about a lot
> of things, but unless they're based on evidence
> ignore them.  There's got to be some connection
> to the evidence.  Everything relating to human
> affairs is open to some possible or imaginary
> doubt, right.  So if the standard was, well, I
> have a doubt[,] you could never convict anybody
> because you're always going to have a doubt.
> And I guarantee you, and the evidence is very
> strong in this case, it should be a relatively
> easy case for you to decide with all this
> evidence.  But somebody is going to get back
> there an[d] say I have a doubt, you know,
> something is bothering me here or I just have
> this feeling.  Well, when they say that, the
> best way to address that is[,] is your doubt
> based on the evidence or are you speculating or
> are you guessing at something, and that's the
> best way to look at that.

4 RT 807-08.

> In his closing rebuttal, the prosecutor stated:
>
> Defense attorney wants you to look at reasonable
> doubt like it's some kind of chain.  Like if I
> can explain one thing away the chain breaks and
> you have reasonable doubt.  No.  And what have I
> been talking about throughout this whole trial?
> You look at all the evidence at the same time.
> You look at everything.  Line them all up and
> you look at them together, because the facts
> that are true will support each other.
> Reasonable doubt is not a chain; it's a rope.
> Every piece of evidence that supports Sarah
> Valdez's statement about [Petitioner's]
> confession of the murder.  Every piece of
> evidence an extra strand is put in that rope.
> Every piece makes that rope bigger and stronger.
> So if the defense is able to explain one strand
> of the rope away, that rope still holds because

41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

        you have many other strands holding it together.
        You look at all the evidence.

4 RT 978-79.

        The state appellate court concluded that the prosecutor's
statements did not shift the burden of proof, but may have
improperly suggested to the jury that, unless a doubt is supported
by some affirmative evidence, it is not reasonable and does not
warrant acquittal.  However, the appellate court found that the
prosecutor's statements were ambiguous because the jury could have
interpreted them to mean that it should account for the evidence in
evaluating any doubts or that a doubt must be demonstrated by some
affirmative evidence.  The first interpretation would be proper,
while the latter interpretation would not.  The court held that the
ambiguity was unlikely to cause the jury to misapply the law because
the jury received several relevant admonitions in its instructions
regarding reasonable doubt, the presumption of innocence, and the
prosecution's burden to prove guilt beyond a reasonable doubt.  The
jury was also instructed that the defendant could choose to rely on
the state of the evidence and upon the failure, if any, of the
People to prove beyond a reasonable doubt every essential element of
the charged crimes and that "[n]o lack of testimony on the
defendant's part will make up for a failure of proof by the People
so as to support a finding against him on any essential element."
People v. Zapata, H030016 at 34.

        The appellate court concluded that, "while the
prosecutor's remarks concerning reasonable doubt were misconduct,
they were comparatively mild and unlikely to lead the jury into

**42**

1  misunderstanding or misapplying the relevant law."  People v.

2  Zapata, H030016 at 34.

3          A prosecutor's mischaracterization of a jury instruction

4  is less likely to render a trial fundamentally unfair than if the

5  trial court issues the instruction erroneously:

> [A]rguments of counsel generally carry less weight with a
> jury than do instructions from the court.  The former are
> not evidence, and are likely viewed as the statements of
> advocates; the latter, we have often recognized, are
> viewed as definitive and binding statements of the law.
> Arguments of counsel which misstate the law are subject to
> objection and to correction by the court.  This is not to
> say that prosecutorial misrepresentations may never have a
> decisive effect on the jury, but only that they are not to
> be judged as having the same force as an instruction from
> the court.

12  Boyde v. California, 494 U.S. 370, 384-85 (1990).

13          The appellate court's conclusion was not unreasonable.

14  Although the prosecutor misstated the law in regard to reasonable

15  doubt, before he gave the jury his interpretation of the

16  instruction, he quoted the actual instruction.  Thus, the jury heard

17  the correct instruction on reasonable doubt from the prosecutor

18  himself and then heard the instruction from the court.  Further, in

19  context of the other jury instructions explaining reasonable doubt

20  and the burden of proof, it is unlikely the jury misunderstood the

21  correct instruction or misapplied it.  Therefore, the state

22  appellate court's denial of this claim was not contrary to or an

23  unreasonable application of established federal authority.

24                               5

25          Petitioner contends the prosecutor committed misconduct by

26  encouraging the jurors to speculate about the victim's subjective

27  experience in the moments before he died because the comments were

28

United States District Court  
For the Northern District of California

not supported by evidence and because they inflamed the passions of the jury.

The prosecutor began his closing rebuttal argument as follows:

> I want to show you guys a picture [sic] Juan
> Trigueros, early morning hours May 19th, 2001.
> He can't get that second tire fixed. He had
> been drinking beer probably four hours after his
> friend Magdaleno Cervantes left him. Pretty sad
> and lonely situation to be in. He gets that car
> over [to the] 7-Eleven to use the pay phone. He
> calls his girlfriend. On the phone call 15, 20
> minutes. . . . Picture, if you will, the last
> words that Juan Trigueros heard before the
> defendant shot him in the back and to make sure
> he was dead shot him in the chest. What were
> the last things he heard? What's the reasonable
> inference of what was going on that precise
> moment the second before he's mortally wounded?
> Fuckin' scrap. You fuckin' wetback. Can you
> imagine the terror and the fear of Juan
> Trigueros must have felt as he's cowering into
> the phone as Puphal told you kind of bending
> into the phone to try avoid this person, to not
> have any issue, to just try get home and lead
> his life. Fuckin' scrap. Wetback. He died
> because he was born in Mexico and he made the
> mistake of wearing a number 8 jersey on
> Leavesley Avenue in the city of Gilroy and made
> the mistake of being at 7-Eleven the same night
> the defendant was partying five blocks away.
> What a way to exit the world.

4 RT 964-65.

The prosecutor repeated this theme twice in later portions of his rebuttal.

A prosecutor may not urge the jurors to convict in order to protect community values, preserve civil order, or deter future lawbreaking. United States v. Sanchez, 659 F.3d 1252, 1256 (9th Cir. 2011). The vice in such an argument is that it increases the possibility that the defendant will be convicted for reasons unrelated to his own guilt. Id. at 1256-57. A prosecutor's

44

"testifying" in the voice of the victim about the circumstances of his killing was misconduct because he "risked improperly inflaming the passions of the jury through his first-person appeal to its sympathies for the victim . . ." <u>Drayden v. White</u>, 232 F.3d 704, 711-13 (9th Cir. 2000).

The state appellate court found that the racial epithets that the prosecutor used were speculation and inflammatory and "wholly extraneous to any issue properly before the jury. . . . The prosecutor could have no reason for mentioning it other than to inflame the jury's sentiments. . . . By deliberately drawing the jury's attention to that irrelevant and improper consideration, the prosecutor committed serious misconduct." <u>People v. Zapata</u>, H030016 at 36-37. However, the court found that this claim was not available on appeal because defense counsel had not objected to these remarks. The court thus looked at whether counsel was ineffective for failing to object and found that the record did not suggest any tactical reason for not objecting. However, the court determined counsel was not ineffective because the evidence was strong and, therefore, it was "highly unlikely that the jury was influenced by the prosecutor's improper argument as opposed to the other strong evidence of defendant's guilt." <u>People v. Zapata</u>, H030016 at 38.

Even though this claim was procedurally defaulted on direct appeal, because the appellate court addressed it, this Court is not barred from reviewing it. See <u>Thomas</u>, 273 F.3d at 1176. Based upon <u>Drayden</u>, the state appellate court correctly decided that these remarks by the prosecutor had no purpose other than to inflame the passion of the jury and, thus, constituted misconduct. Further,

United States District Court
For the Northern District of California

1  as found by the appellate court, because there was no reason for

2  counsel not to object to this misconduct, his failure to do so

3  constituted deficient performance.

4  However, the state appellate court found that counsel's

5  deficient performance was not prejudicial because it was not

6  reasonably probable that a result more favorable to Petitioner would

7  have been reached but for the misconduct.  The finding of no

8  prejudice was reasonable.  Support for this conclusion is found in

9  <u>Drayden</u>.  In that case, the prosecutor's comments were more

10  extensive and inflammatory than those of the prosecutor here, but

11  the court denied habeas relief because: (1) the prosecutor's

12  statements had been supported by reasonable inferences from the

13  evidence; (2) the trial court had instructed the jury that

14  "[s]tatements made by the attorneys during the trial are not

15  evidence" and the jury "must not be influenced by mere sentiment,

16  conjecture, sympathy, passion, prejudice, public opinion or public

17  feeling;" and (3) the evidence of the defendant's guilt was very

18  strong.  232 F.3d at 713-14; <u>see also</u> <u>Fields v. Woodford</u>, 309 F.3d

19  1095, 1109 (9th Cir. 2002) (finding no prejudice from prosecutor's

20  statement, in closing argument, asking jurors to think of themselves

21  as the victim and describing crime from victim's perspective).

22  Here, except for the prosecutor's racial epithets, his statements

23  were supported by reasonable inferences from the evidence, the jury

24  was given the same standard jury instructions as those cited in

25  <u>Drayden</u>, <u>see</u> 5 RT 1057-58, and, as discussed below in the section on

26  prejudice, the evidence against Petitioner was strong.

27  Citing <u>Donnelly</u>, 416 U.S. at 644, Petitioner argues that,

28  because the jury was not instructed to disregard the prosecutor's

United States District Court
For the Northern District of California

improper remarks, the jury thought the remarks were proper and considered them.  Although in <u>Donnelly</u>, the Court gave great weight to the curative instruction to determine that the prosecutor's remark was not prejudicial, the Court also stated, "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. . . . [Thus,] the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions.  Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process."  <u>Id.</u> at 645. Here, although there was no specific curative instruction, there were instructions that specifically told the jury it was not to consider argument by counsel as evidence and that the jury must not be influenced by sentiment, passion or prejudice.  As discussed above, in <u>Drayden</u>, the Ninth Circuit found that these instructions were sufficient to inform the jury that it should not consider the prosecutor's improper remarks in its deliberations.  232 F.3d at 713.

     Therefore, the appellate court's denial of this claim was not contrary to or an unreasonable application of Supreme Court authority.

                                6

     Petitioner contends that the prosecutor improperly argued to the jury that Echeverria's laughter upon seeing the police sketch

**47**

of the suspected killer was a "spontaneous statement" and, thus, was a reliable sign of recognition.

The prosecutor's comment was based on Detective Zen's testimony that, when he showed Echeverria the police sketch, "she laughed or chuckled to herself."  2 RT 548-49.  He asked her why she was laughing and she replied, "something to the effect of, oh, yeah, that's when [Petitioner] was trying to grow a goatee."  2 RT 549.  When commenting on this evidence in his closing argument, the prosecutor said:

> And you've got Nancy Echeverria's statement.
> It's real interesting.  If you think about how
> it was taken.  Look at this?  Remember she said
> on that tape it looks just like him.  It does
> look just like him.  She also--she laughs.
> Laughs like she remembered something, not laughs
> like I'm making something up.  What's with the
> laughs?  These spontaneous statements are
> interesting.  The law recognizes spontaneous
> statements as being accurate and more truthful
> because you don't have time to reflect on that.
> Look at this.  Ha ha, oh, yeah, that's when he
> was trying to grow that scraggly black goatee.
> Looks just like him.

4 RT 985.

The state appellate court agreed that the prosecutor was incorrect in labeling laughter a spontaneous statement because laughter is not a "statement" and, thus, falls outside the hearsay rule where the concept of "spontaneous declaration" belongs. However, the court found that this was not misconduct because the prosecutor was correct in substance in that the spontaneity of a declaration is thought to make it reliable and the spontaneity of Echeverria's laughter would impart to it a similar sign of reliability.

United States District Court
For the Northern District of California

1    Petitioner argues that, because Echeverria first saw the
2 police sketch of the suspect about two to three weeks after the
3 murder in the window of a local store, see 2 Rt 386-87, when
4 Detective Zen showed her the sketch months later, her reaction could
5 not be called "spontaneous."  The fact that Echeverria had seen the
6 sketch sometime before Detective Zen showed it to her, does not make
7 her initial reaction to seeing it a second time months later any
8 less "spontaneous."  Furthermore, based on Detective Zen's version
9 of how Echeverria reacted, the prosecutor's characterization of her
10 laughter as similar to a spontaneous statement was not such an
11 inaccurate statement of the law as to make it misconduct.
12 Therefore, the state appellate court's denial of this claim was not
13 unreasonable.

14                                    7

15    Petitioner argues that, in his closing argument, the
16 prosecutor misstated evidence about Petitioner getting a gun after
17 he saw Trigueros in the phone booth and about the relative heights
18 of Trigueros and the shooter.

19    The prosecutor engages in misconduct when he makes
20 statements to the jury during closing argument which he knows are
21 false, or has very strong reason to doubt, with respect to material
22 facts on which the defendant's defense relied.  United States v.
23 Reyes, 577 F.3d 1069, 1078 (9th Cir. 2009).

24    Petitioner first objects to the following statement:

25    Again, premeditation, arming yourself with a
      gun.  You're premeditating you're going to use
26    that gun.  You put a gun in your pocket and go
      to 7-Eleven where you see a Mexican national at
27    7-Eleven wearing a Kobe Bryant number 8 jersey
      and you go back and get a gun and come back to
28

49

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          assault him.  You're premeditating the use of
          that gun, and that's in evidence.

4 RT 799-800.

          Petitioner contends that there was no evidence that he had
deliberately obtained a gun after observing Trigueros at the 7-
Eleven and so the prosecutor's statement was misleading regarding
premeditation.  The appellate court summarily denied this claim by
relying on the fact that the jurors were instructed that statements
of counsel were not evidence and that they should be guided in all
matters by the evidence that was actually admitted.

          The evidence was that, after Petitioner saw Trigueros, he
yelled and waved his arms for several seconds and then shot him
twice at point blank range, without provocation from Trigueros.
This evidence established premeditation, no matter how the
prosecutor described how Petitioner got the gun.  Therefore, the
prosecutor's statement did not influence the outcome of the verdict.

          Petitioner next objects to the prosecutor's following
statement:

          [Defense attorney] said something about that the
          shooter was shorter than Juan Trigueros.  Where
          did that come from?  There was a measurement of
          the victim Juan while he's on the slab at the
          corner's [sic] office.  But was there ever
          testimony that, yeah, the shooter was shorter or
          taller?  No, there wasn't, because I've got that
          same transcript, folks, that the defense
          attorney held up here.  I've got it, too, and
          there's nothing in here about that.  That's just
          a complete misstatement about what the law is.
          He never said that [Petitioner] is three inches
          shorter than Juan Trigueros.  That's just not in
          the record in any place, not correct and not
          true.  I'm not saying he's misrepresenting
          intentionally.  He's just wrong.

4 RT 970.

Petitioner contends this was a misstatement of the evidence because, on the night of the crime, Puphal described the shooter to the police as standing about five feet five inches tall and weighing between 140 to 150 pounds.

Petitioner accurately describes Puphal's description on the night of the murder.  However, at trial, Puphal described the shooter as standing between five feet five to five feet eight inches and weighing between 150 and 175 pounds.  Also, on the night of the murder, Shell station attendant Joseph Morton testified that the man he saw walking away from the 7-Eleven after the shooting was five feet ten to six feet tall, weighing 180 to 200 pounds.  In his closing argument, defense counsel repeatedly argued that Petitioner could not have been the shooter because he did not match the height or weight estimates of Morton or Puphal, implying that Puphal had testified that the shooter was only five feet five inches tall.

Because there was some evidence that the shooter was only five feet five inches tall, but not definitive testimony that the shooter was "at least three inches shorter than the victim," the prosecutor reasonably could correct defense counsel's statement.  Furthermore, as found by the state appellate court, the jury was instructed that the attorneys' statements were not evidence, and they had heard the testimony regarding the shooter's height and weight.  Thus, the prosecutor's statement was not improper nor was it prejudicial.

8

Petitioner argues that the prosecutor improperly offered his own testimony regarding the registration records for Petitioner's pickup truck.  In discussing the registration records

United States District Court

For the Northern District of California

1   for the truck in his closing argument, the prosecutor noted that the
2   initial registration expired on October 31, 2001, that no additional
3   fees were paid until June 2002, when the truck was re-registered in
4   the name of Rachel Reyes and that this supported the theory that
5   Sparkie had been holding the truck for Petitioner in Stockton from
6   the time of the shooting until June 2002.  4 RT 988.  Petitioner
7   argues that this was improper because, although the records were
8   admitted into evidence, there was no testimony that the truck
9   registration expired in October 2001.

10          The state appellate court denied this claim, noting that
11   the jury was instructed that statements of counsel were not evidence
12   and that they should be guided only by the evidence that was
13   admitted.  The state court's denial of this claim was not
14   unreasonable.  The prosecutor's statement regarding the registration
15   record was brief and not critical to the case.  Furthermore, the
16   jury had the records and could draw their own inferences based on
17   them.  Therefore, the appellate court's denial of this claim was not
18   unreasonable.

19                                D

20      Petitioner argues that the trial court erred by refusing to
21   give an instruction, as requested by counsel, that, if Petitioner
22   had killed Trigueros in the heat of passion as a result of
23   provocation, he could not be guilty of murder but only of the lesser
24   included offense of voluntary manslaughter.  Petitioner contends
25   that this instruction was supported by Puphal's testimony that, when
26   he first approached the 7-Eleven, he had seen two people who were
27   very upset with each other.

28          In Solis v. Garcia, 219 F.3d 922, 928-29 (9th Cir. 2000),

United States District Court

For the Northern District of California

1 the Ninth Circuit held that a state trial court's failure to
2 instruct the jury on lesser included offenses in a non-capital case
3 does not present a federal constitutional question and is,
4 therefore, not cognizable on federal habeas review.  Furthermore,
5 even if this Court could review this claim it would be denied
6 because the state court appellate court's finding that there was
7 insufficient evidence to support a jury instruction on voluntary
8 manslaughter based on provocation was not an unreasonable
9 determination of the facts in light of the record evidence.
10 Therefore, habeas relief on this ground is denied.

11                              E

12        Finally, Petitioner argues that his counsel was
13 ineffective for failing to request a jury instruction which would
14 have explained how provocation can reduce a charge of first degree
15 murder to second degree murder.  The state appellate court denied
16 this claim on the ground that there was no evidence of provocation
17 and, thus, even if the instruction were included, there was no
18 realistic possibility that it would have changed the jury's verdict.

19        The state court's denial of this claim was not an
20 unreasonable determination of the facts in light of the record
21 evidence.  Therefore, habeas relief on this ground is denied.

22                              F

23                              1

24        To determine prejudice from ineffective assistance of
25 counsel, the appropriate question is "'whether there is a reasonable
26 probability that, absent [counsel's] errors, the factfinder would
27 have had a reasonable doubt respecting guilt.'"  Luna v. Cambra, 306
28 F.3d 954, 961 (9th Cir. 2002), amended by 311 F.3d 928 (9th Cir.

United States District Court
For the Northern District of California

1  2002) (quoting <u>Strickland</u>, 466 U.S. at 695).  If the state's case is

2  weak, there is a greater likelihood that the result of the trial

3  would have been different, and vice versa.  <u>Luna</u>, 306 F.3d at 966-

4  67.  "'[P]rejudice may result from the cumulative impact of multiple

5  deficiencies.'"  <u>Harris v. Wood</u>, 64 F.3d 1432, 1438 (9th Cir. 1995).

6          To show prejudice as a result of prosecutorial misconduct,

7  a petitioner must show that the misconduct had a substantial and

8  injurious effect or influence in determining the jury's verdict,

9  <u>Brecht</u>, 507 U.S. at 637-38, and that the trial was infected with

10 unfairness.  <u>Darden</u>, 477 U.S. at 181.

11                                  2

12         Petitioner argues that this was a close case and, thus,

13 any misconduct on the part of counsel or the prosecutor was likely

14 to change the result of the trial or have a substantial and

15 injurious effect or influence in determining the jury's verdict.

16 The state appellate court acknowledged that the prosecution's case

17 was hampered by weaknesses in the identification evidence, but

18 otherwise found that there was a strong case against Petitioner.

19 The following supports the state court's finding of fact.

20         First, the universe of likely suspects was effectively

21 confined to OSP members by the absence of any explanation for the

22 crime other than gang-related hatred and the significance of the

23 number 8 to OSP.  There was evidence that, on the night of the

24 murder, Petitioner was at a party a few blocks away from the 7-

25 Eleven.  Significant evidence supported the finding that

26 Petitioner's pickup was involved in the shooting.  Notably, eye-

27 witness Davila identified Petitioner's truck from the damage to the

28 right side tires, which he said would be there because, on the night

**United States District Court**
For the Northern District of California

1   of the murder, the truck hit a traffic island with its right-side

2   tires when driving away from the murder scene.  The involvement of

3   Petitioner's pickup made it extremely likely that Petitioner was the

4   shooter or the driver.  Because there was evidence that Petitioner

5   was not a good driver, it was likely that, if he and another person

6   decided to confront a perceived Sureño, he would relinquish the

7   driving to his companion.  The similarities between Petitioner's

8   face and the police sketch meant that the gunman was either

9   Petitioner or another OSP member who also resembled the sketch.  As

10  pointed out by the state appellate court, these facts, which were

11  not dependant on the testimony of any witness who had a motive to

12  lie, pointed strongly to Petitioner as the gunman.

13       Furthermore, Sarah Sanchez directly incriminated

14  Petitioner by testifying that he said to her that he "shot up" the

15  7-Eleven.  She admitted that Petitioner was one of two OSP members

16  toward whom she harbored ill will for attacking her and her new

17  boyfriend.  It was shortly after the attack that she told the police

18  about Petitioner's statement to her about his involvement in the 7-

19  Eleven shooting.  The defense attacked her for making up lies to

20  incriminate Petitioner out of revenge.  However, her anger at

21  Petitioner also could be interpreted as motivating her to forego the

22  silence that gang loyalty required so that she could tell the truth

23  about Petitioner's statement, rather than to make up a story about

24  Petitioner.  The jury heard the evidence that put her credibility at

25  issue and chose to believe her.

26       The same is true for Nancy Echeverria, who told Detective

27  Zen that she thought Petitioner was the shooter because his car

28  disappeared the day after the shooting, the police sketch looked

55

like him and he was wearing the same clothes worn by the shooter as described by the eyewitnesses.  The defense elicited testimony that she was angry at Petitioner for cheating on her with other women. The jury heard this and either chose to believe her even though her credibility was questionable or found that the evidence without her testimony was sufficient to find that Petitioner was guilty.

The jury only deliberated three hours to convict Petitioner as charged with first degree murder and the gang-related allegation, even though the trial lasted more than two weeks.  See United States v. Lopez, 500 F.3d 840, 846 (9th Cir. 2007) (length of jury deliberations an indicator of whether case was strong or weak); United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001) (four-day jury deliberations weighed against finding of harmless error because lengthy deliberations suggest a difficult case).  The short time the jury spent deliberating indicates that it thought the case against Petitioner was strong.

It follows that there was no reasonable probability that, absent counsel's errors, the jury would have had a reasonable doubt respecting guilt or that the prosecutor's misconduct had a substantial and injurious effect or influence in determining the jury's verdict or infected the trial with unfairness.

V

For the foregoing reasons, the Petition for a Writ of Habeas Corpus is DENIED.

A Certificate of Appealability is granted, in part.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly

United States District Court

For the Northern District of California

known as a certificate of probable cause to appeal).  28 U.S.C.
§ 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate
of appealability "only if the applicant has made a substantial
showing of the denial of a constitutional right."  28 U.S.C.
§ 2253(c)(2).  The certificate must indicate which issues satisfy
this standard.  Id. § 2253(c)(3).

Petitioner has made a substantial showing of the denial of
a constitutional right on the following claims: (1) ineffective
assistance of counsel based on (a) failing to object to Officer
Zamora's testimony and (b) failing to object to hearsay testimony
regarding Petitioner's truck; and (2) prosecutorial misconduct based
on (a) Griffin error; (b) statements suggesting that the defense had
the burden to establish reasonable doubt; (c) statements designed to
inflame the passions of the jury; and (d) misstatements of the
evidence regarding the relative heights of Petitioner and the
victim.  Petitioner has not made a substantial showing of the denial
of a constitutional right on the other claims in his petition.
Petitioner may not appeal the denial of a Certificate of
Appealability in this Court but may seek a certificate from the
Court of Appeals under Rule 22 of the Federal Rules of Appellate
Procedure.  See Rule 11(a) of the Rules Governing Section 2254
Cases.

The Clerk is directed to enter Judgment in favor of

//

//

//

Respondent and against Petitioner, terminate any pending motions as moot and close the file.

    IT IS SO ORDERED.

DATED      _09/18/2012_              _____
                                    THELTON E. HENDERSON
                                    United States District Judge

G:\PRO-SE\TEH\HC.10\Zapata-10-176-HCDeny.wpd